[File No. 7031.]

JOHN DAWSON, Individually and on Behalf of All Other Taxpayers Similarly Situated, Appellant, v. M. J. TOBIN, as County Auditor of Morton County, North Dakota, et al., Respondents.

(24 NW2d 737.)

Opinion filed October 22, 1946.

*Nilles, Oehlert & Nilles* and *H. C. Young,* for appellant.

*Nels G. Johnson,* Attorney General, *P. O. Sathre, I. A. Acker, C. E. Brace,* and *Richard P. Rausch,* Assistant Attorneys General, *C. E. Kelsch,* Special Assistant Attorney General and *R. F. Gallagher,* State's Attorney, for respondents.

CHRISTIANSON, Ch. J. Plaintiff brought this action for a declaratory judgment pursuant to the provisions of §§ 32–2301—32–2313, North Dakota Revised Code of 1943. The defendants demurred to the complaint on the ground that it does not state facts sufficient to constitute a cause of action. The demurrer was sustained and the plaintiff has appealed.

It is alleged in the complaint that the plaintiff is a citizen and an elector of the state and a resident and taxpayer of Morton County in this state; that he is the owner of a substantial amount of real and personal property in Morton County in this state subject to taxation; that he brings this action in his own behalf and in behalf of all taxpayers similarly situated. The defendant Tobin is the duly elected, qualified, and acting county auditor of Morton County, and the defendant Tavis is the duly elected, qualified, and acting county treasurer of such county, and the defendant Johnson is the duly elected, qualified, and acting attorney general of the State of North Dakota.

The question in controversy is whether in computing the general property tax, property shall be valued in accordance with § 57–0228 of the North Dakota Revised Code of 1943 which provides:—

"The value of all property subject to a general property tax, not exempted by law nor subject to any gross sales or other lieu tax, to be used in the computation of the tax levied, shall be fifty per cent of the full and true value thereof. Assessors and boards of review shall assess and return all taxable property at its full and true value, and the county auditor, after equalization by the state board of equalization, shall make the computations necessary to reduce the assessed value to said fifty per cent."

The controversy here arises as a result of the enactment by the legislative assembly of Chapter 317, Laws 1945, amending and re-enacting the above quoted § 57–0228, NDRC 1943, and repealing all acts and parts of acts in conflict with said Chapter 317, and the subsequent rejection of said Chapter 317 by the people at a referendum election.

It is alleged in the complaint that the defendant Attorney General in the performance of his duties rendered an opinion that the above quoted § 57–0228 has been repealed and is no longer in force; and that instead of using 50 per cent of the full and true value of the property as the basis in the computation of taxes as provided by said § 57–0228, it is the duty of the County Auditor to use as a basis for such computation 100 per cent of the full and true value of the property. It is further alleged that unless enjoined from so doing, or unless it is determined by judgment of the court that said § 57–0228, NDRC 1943, is in force and applicable in the computation of taxes, the defendant County Auditor will compute and spread taxes computed on the basis of 100 per cent of the full and true assessed value of the property and the defendant County Treasurer will collect the taxes as so computed and spread.

The Twenty-eighth Legislative Assembly which convened in January, 1945 enacted Chapter 317, Laws 1945 which read as follows:

"An Act Amending and re-enacting § 57–0228 of the North Dakota Revised Code of 1943 relating to basis of assessment of property for taxation purposes, raising such basis from fifty per cent to seventy-five per cent of the full and true value of such property; repealing all acts and parts of acts in conflict herewith; and declaring an emergency.

Be it Enacted by the Legislative Assembly of the State of North Dakota:

Sec. 1. That § 57–0228 of the North Dakota Revised Code of 1943 be amended and re-enacted to read as follows: The value of all property subject to a general property tax, not exempted by law nor subject to any gross sales or other lieu tax, to be used

in the computation of the tax levied, shall be seventy-five per cent of the full and true value thereof. Assessors and boards of review shall assess and return all taxable property at its full and true value, and the county auditor, after equalization by the state board of equalization, shall make the computations necessary to reduce the assessed value to said seventy-five per cent.

Sec. 2. All acts and parts of acts in conflict herewith are hereby repealed.

Sec. 3. This act is hereby declared to be an emergency act and shall be in full force and effect from and after its passage and approval."

It will be noted that the only change made by said Chapter 317, Laws 1945 in the former law was to increase the percentage of the full and true value of taxable property to be used as a basis in the computation of the tax thereon from 50 per cent to 75 per cent.

Said Chapter 317 was enacted by a vote of two-thirds of the members present and voting in each house, and hence took effect and was in force from and after its passage and approval by the Governor. ND Const, § 67 as amended. It was approved by the Governor on March 12, 1945. Thereafter within the time provided by the constitution, referendum petitions were filed against the measure, and pursuant to such petitions and conformable to the constitution there was submitted to the electors at an election held June 25, 1946 the question, "Shall said referred measure be approved?" At such election the measure was disapproved, there being 56,988 votes cast in the affirmative and 70,983 votes in the negative. The controversy involved here arises as a result of such referendum election.

It is conceded by all the parties that the basis fixed in said Chapter 317 for the valuation of property in computation of taxes no longer prevails. The plaintiff contends that as a result of the disapproval of said Chapter 317 by the electors at the referendum election, the basis of valuation prescribed by § 57-0228, North Dakota Revised Code of 1943, again became applicable in the computation of taxes. The defendants, however,

contend that said § 57–0228 was repealed by said Chapter 317 and that such repeal was not affected by the disapproval of the referred measure. The question thus presented involves an application and construction of the provisions of the state constitution relating to the referendum.

Provisions relating to the initiative and referendum were first embodied in the constitution of this state by constitutional amendments adopted at the general election in November, 1914. Laws 1915, pp 399–401. The provision then adopted relating to the referendum provided:

Sec. 25. "The legislative authority of the state of North Dakota shall be vested in a legislative assembly consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power, at their own option, to approve or reject at the polls any act, item, section or part of any act or measure passed by the legislative assembly. . . . The second power is the referendum, or the power to order any act, item, or part of any act to be referred to the people for their approval or rejection at the polls, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety), as to any measure or any parts, items or sections of any measures passed by the legislative assembly either by a petition signed by ten per cent of the legal voters of the state from a majority of the counties, or by the legislative assembly, if a majority of the members elect vote therefor. When it is necessary for the immediate preservation of the public peace, health or safety that a law shall become effective without delay, such necessity and the facts creating the same shall be stated in one section of the bill, and if upon aye and no vote in each house two-thirds of all the members elected to each house shall vote on a separate roll call in favor of the said law going into instant operation for the immediate preservation of the public peace, health or safety, such law shall become operative upon approval by the governor.' . . . Any measure referred to the people shall take effect when it is approved by a majority

of the votes cast thereon and not otherwise, and shall be in force from the date of the official declaration of the vote." ND Const § 25, as amended, Laws 1915, pp 399–401.

At the general election in November, 1918 there were submitted to the voters of the state pursuant to initiative petition two proposed constitutional amendments relating to the initiative and referendum of statutes—one, an amendment of § 25 of the constitution and the other an amendment of § 67 of the constitution. This court ruled that the amendments had been approved by the electors (State ex rel. Byerley v. State Canvassers, 44 ND 126, 172 NW 80) and the amendments were approved by the legislative assembly and declared to have become a part of the constitution of this state. Laws 1919, Ch 86 and Ch 88. Such amendments wholly superseded the former provisions of the constitution relating to the initiative and referendum of statutes and have remained in force without change. So far as material here the amendments approved at the election in November, 1918 and by the next legislative assembly which convened in January, 1919 provide as follows:—

Sec. 25. "The legislative power of this state shall be vested in a legislature consisting of a senate and a house of representatives. The people, however, reserve the power, first, to propose measures and to enact or reject the same at the polls; second, to approve or reject at the polls any measure or any item, section, part or parts of any measure enacted by the legislature. . . .

The second power reserved is the referendum. Seven thousand electors at large may, by referendum petition, suspend the operation of any measure enacted by the legislature, except an emergency measure. But the filing of a referendum petition against one or more items, sections or parts of any measure, shall not prevent the remainder from going into effect. Such petition shall be filed with the Secretary of State not later than ninety days after the adjournment of the session of the legislature at which such measure was enacted. . . .

Any measure, except an emergency measure, submitted to the electors of the state, shall become a law when approved by a

majority of the votes cast thereon. And such law shall go into effect on the 30th day after the election, unless otherwise specified in the measure.

If a referendum petition is filed against an emergency petition (measure) such measure shall be a law until voted upon by the electors. And if it is then rejected by a majority of the votes cast thereon, it shall be thereby repealed. Any such measure shall be submitted to the electors at a special election if so ordered by the Governor, or if the referendum petition filed against it shall be signed by thirty thousand electors at large. Such special election shall be called by the Governor, and shall be held not less than one hundred nor more than one hundred thirty days after the adjournment of the session of the legislature. . . .

The word 'measure' as used herein shall include any law or amendment thereto, resolution, legislative proposal or enactment of any character.

The veto power of the Governor shall not extend to the measures initiated by or referred to the electors. No measure enacted or approved by a vote of the electors shall be repealed or amended by the legislature, except upon a yea and nay vote upon roll call of two-thirds of all the members elected to each house.

This section shall be self executing and all of its provisions treated as mandatory. Laws may be enacted to facilitate its operation, but no laws shall be enacted to hamper, restrict or impair the exercise of the rights herein reserved to the people." ND Const, § 25, as amended.

Sec. 67. "No act of the legislative assembly shall take effect until July first after the close of the session, unless the legislature by a vote of two-thirds of the members present and voting, in each house, shall declare it an emergency measure, which declaration shall be set forth in the act, provided, however, that no act granting a franchise or special privilege, or act creating any vested right or interest other than in the state, shall be declared an emergency measure. An emergency measure shall take effect and be in force from and after its passage and approval by the Governor." ND Const, § 67, as amended.

726

At the time the above constitutional provisions were adopted and became effective the statutes of this state provided:— "Whenever any act of the legislative assembly is repealed, which repealed a former act such former act is not to be revived, unless it shall be expressly so provided." Comp. Laws of North Dakota 1913, § 7315. This statutory provision was enacted as a part of the laws of the Territory of Dakota in 1877. Dakota Civ C 1877, § 2133. It was borrowed by the territorial legislature from the federal statutes. See, § 12, Ch 2, Title I, Revised Statutes of the United States, Passed at the First Session of the Forty-third Congress, 1873–1874; and reference following § 2133 in Revised Codes Dakota, 1877. It was continued in force without change till the adoption of NDRC 1943 (see § 2, Schedule ND Const; RC 1905, § 6727, CL 1913, § 7315), and was enacted without substantial change as § 1–0216, NDRC 1943.

It is contended by the defendants that because of the provisions of this law (NDRC 1943, § 1–0216), the rejection of said Chapter 317 by the voters at the referendum election did not result in a revival of said § 57–0228, NDRC 1943; that under the provisions of § 25 of the Constitution as amended, said Chapter 317 became a law in full force and effect upon its approval by the Governor; that as a law it became subject to the provisions of said § 1–0216, NDRC 1943; that said Chapter 317 was repealed as a result of the rejection thereof by the voters at the referendum election; that such rejection or repeal had precisely the same effect as the repeal of a law by legislative enactment; and that consequently under the provisions of said § 1–0216, NDRC 1943, the repeal provision in said Chapter 317 remains in full force and effect notwithstanding the rejection of said Chapter 317 by the voters at the referendum election.

We are unable to agree with these contentions. It goes without saying that the amendments of §§ 25 and 67 of the Constitution, as approved by the electors at the election in November, 1918 and by the legislative assembly in January, 1919, superseded the former provisions of the constitution relating to the initiative and referendum (16 CJS pp 88, 89); and that any statute then in existence which in any manner conflicted with such

amendments, limited the scope of the powers therein reserved to the people, or interfered with the exrcise or lessened the efficacy of such powers, were rendered inoperative by such constitutional amendments. 16 CJS p 91. These constitutional amendments constitute both the source and the measure of the powers therein reserved to the people. Section 25, as amended, provides: "The people . . . reserve the power, first to propose measures and to enact and reject the same at the polls; second, to approve or reject at the polls any measure or any item, section, part or parts of any measure enacted by the legislature. . . . This section shall be self executing and all of its provisions treated as mandatory. Laws may be enacted to facilitate its operation, but no laws shall be enacted to hamper, restrict or impair the exercise of the rights herein reserved to the people."

The amendment of § 25 of the Constitution approved by the electors in November, 1918 enlarged the scope of the referendum. The provisions relating to the referendum in force prior to the amendment approved by the electors in November, 1918 applied only to laws. The constitutional amendment approved in November, 1918 and now in force extended the scope of the power of the referendum so as to include not only "any law or amendment thereto," but to include also any "resolution, legislative proposal, or enactment of any character." The constitutional provision in force prior to the adoption of the constitutional amendment approved at the election in November, 1918 did not render all laws subject to the referendum. Certain laws were excepted. The legislature by appropriate action could withdraw laws "necessary for the immediate preservation of the public peace, health or safety" from the operation of the referendum. The constitutional provisions relating to the referendum in force prior to the adoption of the constitutional amendment approved at the election in November, 1918, provided:

"When it is necessary for the immediate preservation of the public peace, health or safety that a law shall become effective without delay, such necessity and the facts creating the same shall be stated in one section of the bill, and if upon aye and no

vote in each house two-thirds of all the members elected to each house shall vote on a separate roll call in favor of the said law going into instant operation for the immediate preservation of the public peace, health or safety, such law shall become operative upon approval by the Governor." Laws 1915, p 400.

Such constitutional provisions expressly excepted from the operation of the referendum, all laws "necessary for the immediate preservation of the public peace, health or safety" containing the prescribed declaration of necessity and passed by the required vote. Laws ND 1915, p 400. In the constitutional amendments approved at the election in November, 1918 this exception was eliminated and all laws enacted by the legislative assembly were made subject to the referendum. ND Const, § 25, as amended, Laws 1919, p 504; 3 NDRC 1943, p 1701. The amendments approved in November, 1918 authorized the legislative assembly (with certain exceptions) to enact emergency measures to "take effect and be in force from and after . . . passage and approval by the governor." ND Const, § 67, as amended, Laws 1919, p 506; 3 NDRC 1943, pp 1706, 1707. But such emergency measures were made subject to the referendum. ND Const, § 25 as amended, Laws 1919, p 504, 3 NDRC 1943, p 1701. Specifically, it was provided that if "the legislature by a vote of two-thirds of the members present and voting, in each house, shall declare it an emergency measure, which declaration shall be set forth in the act," then such "emergency measure shall take effect and be in force from and after its passage and approval by the governor;" but "that no Act granting a franchise or special privilege, or Act creating a vested right or interest other than in the State, shall be declared an emergency measure."

It will be noted that when a referendum petition is filed against a measure, other than an emergency measure, such measure does not go into effect but the operation thereof is suspended until a referendum election is held. If at such election the measure is approved by a majority of the votes cast thereon, it goes into effect on the 30th day after the election unless otherwise specified in the measure; but if it is not approved by a

majority of the votes so cast, the measure ceases to have any effect for any purpose.

It is a matter of common knowledge that situations may and do arise where public interest requires that a law be put into immediate effect. This was recognized in the constitution of this state as originally adopted. ND Const, § 67. It was also recognized in the provisions for the initiative and referendum approved at the general election in 1914. As has been pointed out, it was therein provided that a law necessary for the immediate preservation of the public peace, health or safety should become operative upon approval by the Governor, and should not be subject to the referendum, where the necessity and the facts creating the same were stated in one section of the bill and two-thirds of all the members elected to each house, on a separate roll call, voted in favor of said law going into instant operation.

The need to make provision for the enactment of emergency legislation to go into immediate effect was also recognized in the constitutional amendments approved at the election in November, 1918. In such amendments the legislature was authorized to enact emergency legislation and, by appropriate declaration of emergency set forth in the measure, and the passage thereof by a vote of two-thirds of the members present and voting in each house, put the measure into immediate effect upon its approval by the Governor. But such emergency measure remained subject to the operation of a referendum. The people reserved the right to refer any emergency measure notwithstanding the fact that such measure was then operative as a law. They further reserved the right to cause an emergency measure, that has been put into effect, to be submitted to the people for approval or rejection without undue delay. They provided that when referendum petitions signed by 30,000 electors at large are filed against an emergency measure, the Governor shall call a special election to be held not less than 100 nor more than 130 days after the adjournment of the session of the legislature at which the measure was enacted.

Section 25 of the Constitution, as amended and now in force,

did not merely adopt the initiative and referendum as a general principle or policy, and leave it to the legislative assembly to put it into operation. It went much farther, it supplied the rules by means of which the rights which it granted might be enjoyed and protected, the powers which it reserved might be exercised, and the duties which it imposed might be enforced, without aid of any legislative enactment. Furthermore, it specifically declared that it "shall be self-executing and all its provisions treated as mandatory." Nothing was required to be done by the legislature to put it into operation. All its provisions became operative the instant the amendment became a part of the constitution. It permitted the legislature to enact laws "to facilitate its operation," but it specifically inhibited the legislature from enacting any laws "to hamper, restrict or impair the exercise of the rights" therein reserved to the people.

The sole object sought in construing a constitutional provision is to ascertain and give effect to the intention and purpose of the framers and of the people who adopted it, and all rules of construction are subservient to, and intended to effectuate, such object. 11 CJS p 51; 11 Am Jur 674, Constitutional Law. Primarily such intention and purpose are to be found in and deduced from the language that has been used. 16 CJS p 56; 11 Am Jur 678. Constitutional Law. See also State v. Rother, 56 ND 875, 886, 219 NW 574, 578; Dickinson v. Thress, 69 ND 748, 290 NW 653; United States v. Goldenberg, 168 US 95, 102, 103, 42 L ed 394, 398, 18 S Ct 3.

"It is a general principle that intention to which force is to be given is that which is embodied and expressed in the constitutional provisions themselves; for words are the common signs that mankind make use of to declare their intention to one another. When the words of a man express his meaning plainly, distinctly, and perfectly there is no occasion to have recourse to any other means of interpretation. The court therefore in construing a constitutional enactment is usually said to be limited to the language of the enactment itself. . . . The rule is sometimes stated more completely that a constitutional provision which is positive and free from all ambiguity must be accepted

by the court as it reads. . . . In other words the courts are not at liberty to search for its meaning beyond the instrument, nor are they at liberty by a resort to the refinements of legal learning, to restrict an obvious meaning. Language which is plain and easily understood should be looked to without extrinsic aid for the meaning intended." 11 Am Jur 678, 679, Constitutional Law.

The constitutional provisions reserving the powers of the initiative and referendum to the people of this state involved here are not couched in doubtful or ambiguous terms. Section 25 of the Constitution, as amended, states:—"The legislative power of this state shall be vested in the legislature consisting of a senate and a house of representatives. *The people, however, reserve the power, . . . to approve or reject at the polls any measure or any item, section, part or parts of any measure enacted by the legislature."*

This language is clear and specific. The scope of the power of the referendum as here stated is as broad as the power of the legislature to enact laws. It is stated specifically and emphatically that *the people "reserve the power . . . to approve or reject at the polls any measure or any item, section, part or parts of any measure enacted by the legislature."* The language used clearly evidences an intention and purpose that no enactment by the legislature and no part of any enactment by the legislature is excepted or withdrawn from the operation of the power of the referendum. Nothing is said in the constitutional amendment which in any manner limits the purpose and scope of the power of the referendum as thus first clearly and specifically declared. Indeed, there is no contention that anything said in the constitution limits the power of the referendum or prevents it from being invoked against any measure enacted by the legislature and against any and every part of any measure enacted by the legislature.

The contention that the rejection of said Chapter 317 at the referendum election did not operate to abrogate and annul the repeal provisions of said chapter is not predicated upon anything that is said in the constitution. It is predicated upon a

statutory enactment, namely ND RC 1943, § 1–0216, which reads as follows:

"Whenever any act of the legislative assembly which repealed a former act is repealed, such former act shall not be revived by such repeal, unless there is express provision to the contrary."

In our opinion this statute has no application to and does not affect repeal provisions in an emergency measure that is rejected at a referendum election and as a result is "thereby repealed."

The statute as so applied would conflict with the provisions of § 25 of the constitution and infringe upon the power of the referendum as therein reserved.

If the contentions of the defendants are sustained it would necessarily follow that repeal provisions in an emergency measure will be withdrawn from the operation of the referendum. Thus, if the legislature enacts an emergency measure for the sole purpose of repealing a law, it will not be possible for the people under the power of the referendum to abrogate or recall the repealing act. According to such contentions a repealing act enacted by the legislature as an emergency measure will remain in full force and effect notwithstanding a rejection thereof by the people at a referendum election. Indeed, such election would be an idle and futile act. It seems clear that any statute which would bring about such result when applied to a repealing clause in an emergency measure that is rejected at a referendum election would infringe upon the power of the referendum as reserved in the constitution and conflict with the constitutional provisions relating to the referendum. It would restrict the scope of the referendum power reserved in the constitution. It would in effect withdraw and except from the operation of the referendum power all repealing laws or repealing provisions in laws that are enacted as emergency measures and would operate to prevent the people from rejecting and thereby abrogating or recalling such repealing laws through the exercise of the power of the referendum. Any law in existence when the referendum provisions came into existence which would prevent the power of the referendum to be so exercised would be in conflict with such provisions and would be superseded and

rendered inoperative as applied to a measure rejected and "repealed" at the referendum election. 16 CJS p 91, § 43. And the constitutional provision relating to the referendum expressly inhibits the legislature from enacting any law that will "hamper, restrict or impair the exercise of the rights herein reserved to the people."

Section 1–0216, supra, according to its terms, is not applicable to a "repeal" resulting from the rejection of an emergency measure at a referendum election.

Defendants' contention that said section is applicable to the "repeal" of an emergency measure, which contains a repealing clause, resulting from the rejection of such measure at a referendum election is predicated upon the following provision in § 25 of the Constitution:—

"If a referendum petition is filed against an emergency petition (measure) such measure shall be a law until voted upon by the electors. And if it is then rejected by a majority of the votes cast thereon, it shall be thereby repealed."

It is contended that according to this provision an emergency measure becomes a law upon its passage and approval by the Governor, and that when such emergency measure contains a repealing provision and such measure is rejected at a referendum election and "thereby repealed," such "repeal" comes within the purview of said § 1–0216, supra, and consequently the rejection of such emergency measure at the referendum election does not revive the statute which the repealing clause in the emergency measure repealed.

Corpus Juris (54 CJ p 402) defines the verb "repeal" as meaning:—"To abolish; to abrogate; to annul; to call back; to cancel; to dismiss; to give up; to recall; to rescind or abrogate by authority, or by the same power that made or enacted; to retract; to reverse; to revoke."

Ordinarily, the term "repeal" as applied to legislation "signifies an abrogation of one statute by another." Butte & B. Consol. Min. Co. v. Montana Ore Purchasing Co. 24 Mont 125, 60 P 1039; Sutherland, Statutory Construction, p 177; Abbott, Law

Dictionary title Repeal; Gregory v. Cockrell, 179 Ark 719, 18 SW2d 362, 363.

Bouvier's Law Dictionary and the Cyclopedic Law Dictionary define "repeal" thus:—"The abrogation or destruction of a law by a legislative act."

Black's Law Dictionary (3d ed) gives the following definition:—"The abrogation or annulling of a previously existing law by the enactment of a subsequent statute which declares that the former law shall be revoked and abrogated, (which is called 'express' repeal,) or which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force, (called 'implied' repeal)."

"The term 'repeal' with reference to statutes means the abrogation of a previously existing law by a subsequent statute, which either declares that the former shall be revoked, or which contains provisions so irreconcilable with those of the earlier law that only one of the two can remain in force; the former being an express repeal and the latter an implied repeal."  St. Louis v. Kellman, 235 Mo 687, 139 SW 443.

In 37 Words & Phrases, Perm ed, p 8, it is said:—"The term 'repeal' is synonymous with 'annul,' 'cancel,' 'reverse,' and 'abolish,' so that a statute or ordinance is repealed when it is destroyed, abolished, abrogated, canceled, annulled, recalled, or rescinded by a later one.  St. Louis v. Kellman, 235 Mo 687, 139 SW 443, 445; Wilson v. People, 36 Colo 418, 85 P 187, 189."

There can be no doubt that Congress employed the term "repeal" as signifying the abrogation of a previously existing law by a subsequent statute.  The provision was embodied in an act entitled "An act prescribing the Form of the enacting and resolving Clauses of Acts and Resolutions of Congress, and Rules for the Construction thereof," approved February 25, 1871.  See 16 US Stat Ch 71, § 3, pp 431, 432.  Nor can there be any doubt that the territorial legislature when it borrowed and adopted the statute in this jurisdiction employed the term "repeal" in the same sense.  Not only was this the manner in which statutes ordinarily would be repealed, but the language of the statute itself recognized the right to obviate the anti-re-

viver effect of the statute by making provision in the repealing act that the original act should be revived. The language of the statute clearly indicates that the repeal to which it refers is a repeal of an existing law by means of an enactment by the law-making power because it specifically recognizes that the act which repeals a repealing act may contain provisions which would obviate the rule of anti-reviver prescribed by the section.

According to the language of the statute the anti-reviver rule prescribed thereby is not applicable to a repealing act where "*there is express provision to the contrary*." Such express provision could be made only in a repealing measure enacted by the lawmaking power. The anti-revival provision, as the title of the Act of Congress indicated, was "a rule of construction applicable when not otherwise provided . . . to be read and construed as a part of all subsequent repealing statutes," but a repealing statute could not be so construed and read where the language thereof evidenced a legislative intention to the contrary. Hertz v. Woodman, 218 US 205, 217, 54 L ed 1001, 1007, 30 S Ct 621; Great Northern R. Co. v. United States, 208 US 452, 465, 52 L ed 567, 575, 28 S Ct 313. In other words, the anti-reviver provision applied only when the repealing statute was silent, and was not applicable where the repealing act contained provisions showing a legislative intention that the repeal of the repealing act should operate to revive the former statute. Wilson v. People, 36 Colo 418, 85 P 187; Hertz v. Woodman, 218 US 205, 54 L ed 1001, 30 S Ct 621, supra; Great Northern R. Co. v. United States, 208 US 452, 465, 52 L ed 567, 575, 28 S Ct 313.

Obviously, it is impossible for the petitioners in a referendum petition, or for the people at a referendum election, to make any provision qualifying the effect which will follow as a legal consequence from the rejection of the referred measure. The only question that is or can be submitted at a referendum election is whether the referred measure, or such parts thereof as are referred, shall be approved or rejected. It is impossible for the petitioners in a referendum petition, or for the people at a referendum election, to make "express provision to the contrary" as the anti-reviver statute implies may be done. Under the ref-

erendum provisions of the constitution the lawmaking power of the legislature is not final but is in every instance subject to the reserved power of the people to approve or reject any measure or any item or any part of any measure. A legislative enactment becomes final only in the sense that the legislative processes are completed, and that it is no longer subject to rejection— (through the legislative power reserved by the people)—either when the time for invoking the power of the referendum has passed without such power being invoked, or when the measure has been approved at the referendum election.

The rejection of an emergency measure at a referendum election is a legislative action,—an action taken in the course of legislating. But such action does not result in a legislative enactment, any more than the refusal of one of the houses of the legislative assembly to approve an act passed by the other results in a legislative enactment. It results in disapproval and disaffirmance of the action of the legislature, and in the recall and destruction of the law which the legislature enacted. The emergency measure is given the force and effect of law from the time of its approval; but the period of its existence is indefinite and contingent upon what may be, and is, done under the power of the referendum. The people have the last word. If the referendum is not invoked, or if the referndum is invoked and the measure is approved at the referendum election it remains law; but if it is rejected at the referendum election "by a majority of the votes cast thereon" it is "thereby repealed,"— i. e. recalled and destroyed and ceases to have any effect from and after the time the rejection of the measure at the referendum election takes effect.

It is argued by the defendants that a repeal of said Chapter 317 and a re-instatement of the former law could have been accomplished by the initiation of a law containing the provisions of the former law, and that that is the method which should have been adopted by those who caused said Chapter 317 to be referred. True, the intiative extends to all types of legislation. It is as broad as the lawmaking power of the legislature, and the repeal of a statute, expressly or by necessary implication, may

doubtless be accomplished by an initiative measure. And, of course, the provisions of a law which has been repealed may again be adopted and put in force by the enactment of another statute containing the provisions of the former repealed law. But those who desire to have the people pass final judgment upon whether a measure enacted by the legislature shall be approved or rejected are not required to invoke the initiative power. The power of the referendum is reserved to enable the people to pass final judgment on whether laws enacted by the legislative assembly shall be approved or rejected. The principal purpose to be served by the referendum is to enable the people to reject laws which they find to be unsatisfactory or undesirable. The referendum is more expeditious and efficient for this purpose than is the initiative. Thus, as to measures other than emergency measures, the filing of a referendum petition suspends the operation of the law until a referendum election is held. If the law is then rejected, it never goes into operation at all. In case of an emergency measure, those who invoke the power of the referendum may have the question whether the measure shall be approved or rejected submitted to the people and determined without undue delay. Upon filing referendum petitions signed by 30,000 electors at large, it is obligatory upon the Governor to call a special referendum election to be held not less than 100 nor more than 130 days after the adjournment of the session of the legislature at which the measure was enacted. There are no comparable provisions applicable to the initiative.

The effect of the initiative and referendum provisions of the constitution is "to make the lawmaking power of the Legislature not final but subject to the will of the people and to confer that power in the last analysis upon the people themselves." Re Opinion of Justices, 118 Me 544, 549, 107 A 673, 675, 5 ALR 1412.

The initiative and referendum are both phases of legislative processes, but they are wholly separate and independent powers. The constitution declares them as separate powers. The power of the initiative is no broader in scope for the initiation of laws

than is the power of the referendum for the rejection of laws enacted by the legislature.

The constitution says:—"The people . . . reserve the power . . . *to reject* at the polls any measure or any item, section, part or parts of any measure enacted by the legislature." To "reject," as defined by Webster, means:—to refuse to adopt; to refuse to have or use; to cast or throw away, as useless, unsatisfactory etc.; to discard; relegate.

The broad power reserved and vested in the people to reject laws is not limited by any other constitutional provisions. It applies to every measure enacted by the legislature including emergency measures. It applies as well to repealing laws and repealing provisions as to other laws and provisions.

It is contended by the defendants that according to the decision of this court in Cuthbert v. Smutz, 68 ND 575, 282 NW 494, the rejection of an emergency measure at a referendum election results in a repeal within the provisions of § 1–0216, supra, and renders the provisions of that section applicable where the emergency measure rejected at the referendum election contains a repeal clause.

The question under consideration here was not involved or presented in Cuthbert v. Smutz, supra. That case involved an emergency measure which increased the rates of income taxes and decreased exemptions. The enactment by its terms was "effective on all income received during the year ending December 31, 1935." A referendum petition was filed and at the referendum election held June 24, 1936, the measure was rejected. The taxes involved in that case were laid on income received during the year ending December 31, 1935. The plaintiff would not have been subject to such tax under the law as it existed prior to the enactment of the emergency measure. The taxes were paid involuntarily and the plaintiff brought action to recover the amount of the payment and assailed the validity of the tax on the grounds:

1. That the declaration of emergency was without foundation and wholly false; that it was attached to the measure for the

sole purpose of preventing the free exercise of the power of the referendum against the measure and with the view of frustrating the referendum provisions of the constitution; and that consequently such emergency declaration was unconstitutional and void.

2. That the repeal or abrogation of the emergency measure resulting from the rejection thereof at the referendum election nullified all taxes and all liability for taxes imposed and levied under the law; that the rejection and abrogation of the measure nullified the law and all rights and obligations thereunder from the very beginning.

This court held that under the constitution the declaration of emergency stated in the emergency measure and adopted by the legislature was conclusive upon the courts; that under the constitution the emergency measure was in full force and effect as a law from and after its passage and approval and remained so until its rejection at the referendum election held June 24, 1936, and that consequently taxes imposed and levied thereunder on income received during the year ending December 31, 1935 were valid.

In disposing of the second contention of the plaintiff in that case, namely, that the rejection and repeal of the law at the referendum election nullified the emergency measure from the beginning and nullified and canceled all taxes imposed and levied under it, this court said:—

"The second proposition deals with the effect of the election. The election was held June 24, 1936. Therefore, this emergency measure was a law of the state until June 24, 1936, at least. By the terms of the statute the act was 'effective on all income received during the year ending December 31, 1935.' (§ 5 of the Act.) The law therefore was a valid legislative act during the time this income was earned.

*Appellant urges that the repeal of the law canceled all right to collect this income tax. There is no question but what the adverse vote repealed the law; but this repeal is no different in its nature than the repeal of a legislative act by a subsequent legislature. The repeal by the vote of the people is exactly the same*

*kind of a repeal as if it were enacted by a subsequent legislature —no more and no less."* 68 ND 593, 282 NW 501.

We have italicized the language upon which defendants place especial reliance.

It will be noted that what was said related solely to the question whether the emergency measure was effective and had the force and effect of law until rejected at the referendum election. No question was involved or considered in that case with respect to the meaning or effect of § 1–0216, supra. The language that was used must be construed in light of and restricted to the question to which it was directed.

Said Chief Justice Marshall:—

"It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Cohen v. Virginia, 6 Wheat. (US) 264, 399, 5 L ed 257, 290.

"It is a general rule that the positive authority of a decision is co-extensive only with the facts on which it is made." Ogden v. Saunders, 12 Wheat. (US) 333, 6 L ed 647.

Chapter 317, Laws 1945 contained three sections. The first section amended and re-enacted § 57–0228, RC 1943, so as to increase the percentage of the full and true value of taxable property to be used as a basis in the computation of the tax thereon from 50 per cent to 75 per cent. The second section provided that all acts and parts of acts in conflict with said Chapter 317 "are hereby repealed." The third section contained a declaration of emergency. The sole purpose of the emergency declaration in the third section was to have the act go into force and effect upon its passage and approval by the Governor. The referendum petitions filed against said Chapter 317, Laws 1945 were directed at the whole measure. They were directed as much at the repealing provision in § 2 as at the provision in § 1 which increased the percentage of the full and true value of taxable property to be used as a basis in the computation of the tax thereon from 50 per cent to 75 per cent. The referendum petitions invoked the power reserved in the people to determine whether the whole measure should be approved or rejected. The

question upon which the legislative power of the people was thus invoked involved every provision of the measure. Each vote cast at the referendum election for approval was cast in favor of the approval of both §§ 1 and 2 of the measure, and each vote cast in the negative was cast for the rejection of both §§ 1 and 2. The people by their vote said:—"We reject the entire measure. We reject both § 1 and § 2."

It necessarily follows that from the time such rejection became effective the whole emergency measure, including the repealing provision therein, was recalled and destroyed, and that the law that had been replaced and superseded by the rejected emergency measure was revived.

The order appealed from is reversed and the cause is remanded for further proceedings conformable to the law.

BURR, NUESSLE, BURKE and MORRIS, JJ., concur.