**JERROLD ELECTRONICS CORPORATION and Jerrold-Northwest, Inc., Appellants,**

v.

**WESCOAST BROADCASTING COMPANY, Inc., a Washington corporation, d/b/a KPQ Radio, Appellee.**

No. 19343.

United States Court of Appeals
Ninth Circuit.

Jan. 22, 1965.

Rehearing Denied March 1, 1965.

Israel Packel, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., Paul Fetterman, Helsell, Paul, Fetterman, Todd & Hokanson, Seattle, Wash., for appellants.

Charles S. Burdell, Thomas J. Greenan, Ferguson & Burdell, Seattle, Wash., G. Joseph Bertain, Jr., San Francisco, Cal., for appellee.

Before CHAMBERS, POPE and KOELSCH, Circuit Judges.

POPE, Circuit Judge.

This is a private antitrust action wherein the plaintiff Wescoast Broadcasting Company, Inc., alleged that the defendants Jerrold Electronics Corporation and Jerrold-Northwest, Inc., had been guilty of violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[1] After trial the jury returned a verdict in favor of the plaintiff assessing plaintiff's damages in the sum of $97,500 which was trebled, and judgment, including an award of $32,500 as attorneys' fees, was awarded plaintiff in the sum of $325,000. The defendants have perfected this appeal from that judgment.

About the end of 1950 Jerrold Electronics Corporation (here called Jerrold) began the manufacture and sale of community television antenna systems. The parties stipulated that the following is a description of the nature and purpose of such systems. "Community television antenna systems are constructed in communities remote from television broadcasting stations and enable inhabitants of such communities to view television programs emanating from said television broadcasting stations. Television signals travel in straight lines. At a distance remote from a television broadcasting station the curvature of the earth causes the path of the signal to lead off into space. In order to capture the signal, a community antenna, which is a giant receiving tower, is usually constructed on the highest point near the area to be served. The signals picked up by the antenna are amplified and transmitted by cable to the community. This cable is normally strung along telephone and power company poles throughout the community and connected by smaller cable or feeder lines to television sets located in the homes of those persons desiring to be served by the system. The operators of community television systems usually charge those desiring service from the system an initial hook-up fee and a smaller monthly service charge payable as long as they are served by the system." It was also stipulated that Jerrold manufactured and sold such systems in interstate commerce throughout the United States.

By July, 1953, somewhere between two-thirds and four-fifths of all such systems in the United States were supplied exclusively with Jerrold equipment. At that time, which is the time relevant to this controversy, Jerrold had thus become a dominant figure in the manufacture of such community antenna systems. One feature of the Jerrold system was a component known as its AGC (automatic gain control) device. This component, during the time hereafter referred to, was as a practical matter essential to the construction of a fully effective antenna system. It was not obtainable elsewhere.[2]

In selling its systems Jerrold had followed a general policy under which none of its equipment would be sold to a community television antenna operator unless the buyer agreed to purchase all of the equipment of his system from Jerrold. The buyer was also required as a condition of such purchase to enter into a service contract with Jerrold. This

---

1. As originally filed, the complaint also charged violations of §§ 3 and 7 of the Clayton Act (15 U.S.C. §§ 14, 18). At the trial plaintiff abandoned its claim under the latter two sections and the case was submitted to the jury under §§ 1 and 2 of the Sherman Act.

2. A community antenna system, without the AGC component, would be required to control the output of its signal through the use of an operator using manual control. Without such control the signals would so vary in intensity as to prevent adequate transmission of television images.

contract provided that Jerrold would perform engineering services with respect to the layout, installation and operation of the system, for which services it was to receive fixed sums and installment payments payable out of the income receipts of the system operator.[3] Distribution of Jerrold equipment in the Northwest (Washington, Oregon, Idaho and Western Montana) was handled through Jerrold-Northwest, Inc., here called Jerrold-Northwest. Sixty-five percent of the stock ownership of Jerrold-Northwest was in the control of Jerrold. The remainder of said stock was owned by Phillip D. Hamlin and Ron Merritt who were officers of the company. Shapp, president of Jerrold, was president of Jerrold-Northwest.[4] Elsewhere throughout the United States similar subsidiary corporations were established for the purpose of controlling the distribution of Jerrold's manufactured equipment and components.

In 1952 a television broadcasting station was established at Spokane, Wash. In consequence of this it became feasible to operate a community antenna system at Wenatchee, Washington, and early in 1953, Wescoast Broadcasting Company, Inc., (here called Wescoast) prepared to establish such a system at Wenatchee. At that time Wescoast was operating a radio station at Wenatchee using the call letters KPQ. James W. Wallace, a stockholder, was president of Wescoast, and Rogan Jones of Bellingham, Wash., was the majority stockholder. Jones had constructed a community television antenna system at Bellingham which was then in operation. In anticipation of the establishment of the Wenatchee system, Wescoast contacted Video Associates, predecessor of Jerrold-Northwest, the distributors of Jerrold equipment, for the purpose of procuring Jerrold equipment and components for its Wenatchee system.

At first Wescoast received a communication from the distributor indicating its willingness to supply the complete Jerrold system. This was by a letter dated February 16, 1953. Wescoast submitted a purchase order for this equipment. While this order was waiting to be filled, Merritt was in the East having a conference with Shapp, president of Jerrold. Shapp and Merritt discussed among themselves and also with representatives of J. H. Whitney & Co., here called Whitney, of New York, the possibility of putting into effect in the Northwest area an arrangement which Shapp had made with Whitney in March, 1952. The matter was also discussed at the same time, by telephone, with Hamlin, with one Brown, representing Whitney, and one Tucker, representing Jerrold. At that March, 1952, date, Shapp had proposed to Whitney that the latter assist in the development of community television antenna systems in a number of different sections of the country. The agreement was that Shapp, representing Jerrold, and Whitney would mutually agree upon a list of communities in which the establishment of such systems appeared to be feasible. Whitney would pay for preliminary surveys and field tests; Shapp would assist in the survey and prepare reports, and then Whitney would decide whether to proceed with an installation of a system in a given community. If such a decision were made Whitney would cause a corporation to be organized to install and operate the system. In that event Whitney would supply the necessary funds to finance the system, Whitney and its associates would acquire a 75% common stock interest in the corporation, and Shapp and his associates would receive a 25% common stock interest. The

---

3. The payments required were $5 for each "connection", that is, for each subscriber under the system, with 25 cents per subscriber per month for as long as the connection continued.

4. In the early part of 1953 Hamlin and Merritt were operating a concern known as Video Associates. It appears to have been operated in conjunction with Jerrold but after some 60 days it was dissolved and Jerrold-Northwest formed to take its place.

agreement was to cover the entire United States with the exception of the State of Maine.

This was the investment plan which Shapp and Merritt and the others mentioned discussed while the Wescoast order for the Jerrold equipment was still pending and not yet filled. In that discussion Merritt, the Whitney interests, Shapp and Hamlin considered a program whereby they would make a survey of some 12 to 15 communities in the Northwest with a view to carrying out the Shapp-Whitney plan. Hamlin, Brown and Tucker then proceeded to make surveys of certain towns in Idaho, Washington and Oregon. It was ascertained that Whitney was interested in certain towns in Idaho and Washington, including the town of Wenatchee.[5]

The trip of Merritt to the East, during which these conversations and discussions occurred, took place in March, 1953. It would appear to be significant then that on March 31, 1953, Hamlin, on behalf of Video Associates, which, it will be recalled, had received Wescoast's purchase order for Jerrold community antenna system equipment, wrote to Wescoast referring to that order and advising the latter that although Hamlin's concern had already scheduled this material to be shipped direct from the Jerrold factory, Hamlin had recently received information from Jerrold having

a direct bearing on the order and upon any subsequent orders that Wescoast might make which would prevent the delivery of this equipment as per the order. In this letter Wescoast was informed that Jerrold offered in conjunction with all of their community antenna installations a comprehensive service contract of the character which we have previously described, and that Jerrold would not sell any of their equipment except in connection with such a service contract. Hamlin stated that he did not propose to debate with Wescoast the question of the latter's fitness to install the equipment without such a service arrangement but that since the condition on sales was imposed by Jerrold the order could not be filled.[6]

Simultaneously Merritt sent a copy of the letter, also dated March 31, 1953, which began as follows: "Please note enclosed copy of a letter written to Rogan Jones specifically in regard to the Wenatchee deal. Relative to this, please see that no merchandise is drop-shipped to Wenatchee, Washington on our purchase order #9890 (unless same is already on the way). And, of course, you know that our writing of this letter is in a way to serve a double purpose, and that is to set this deal up for the Whitney interests. Better file this particular letter in the waste basket after you read it for obvious reasons."[7]

5. Shapp, in his testimony below, listed such towns as Lewiston, Idaho, and Richland, Kennewick, Pasco, Wenatchee, Clarkston and Walla Walla, in Washington. He testified that these met the criteria described in the arrangement with Whitney and stated that Whitney was interested in investing in community antenna systems in those places.

6. The reason given in this letter for Jerrold demanding this tie-in was that when its equipment had been installed without provisions for performing the servicing and engineering work called for by the service contracts, citizens, complaining of defective transmission and of defective service, had sued or threatened suit against the antenna companies naming Jerrold as a codefendant in the suit. It was said that to avoid this sort of

thing Jerrold was insisting on the service contract permitting it to perform all engineering services in connection with the operation and installation of the antenna systems.

7. This letter then went on to discuss the general question of the feasibility and desirability of the tie-in of the service contract with sales of Jerrold equipment. Merritt stated: "I am still not completely convinced that you have the legal right to hang a service contract on to the sale of all your merchandise," but the writer proceeded to assure Jerrold that he, Merritt, would continue to be insistent upon purchasers signing the service contract. The letter also suggested the advisability for procuring legal advice as to alternative methods of protecting Jerrold against possible suits by persons who

It seems plain that these letters furnish a key to what Hamlin, Merritt and Jerrold were up to. As stated in the letter of transmission to Jerrold, to which we have referred, the writing of that letter was "to serve a double purpose and that is to set this deal up for the Whitney interests." In short, the purpose was not to induce Wescoast to agree to sign the service contract but rather to induce Wescoast not to buy the Jerrold equipment. In that manner Wescoast would be denied whatever advantages were attainable from such equipment. This is made doubly clear by a letter written by Merritt to Jerrold on April 14, 1953, in which he said, referring to Jerrold's attitude toward selling the community antenna system with the service contract included as a package, "I hope you were not too concerned over the text of the letter we wrote to [Wescoast]. Where would the Whitney boys have been in the Wenatchee deal if I had 'sugared' this letter up to the point where he took up our service contract instead of skipping the whole deal." [8]

It thus seems reasonably clear that after Hamlin and Merritt had been advised of the arrangement between Shapp and Whitney for the development by them in the manner previously mentioned of the sundry community antenna systems in these Northwest cities, Hamlin and Merritt undertook to see to it that Wescoast would not get the Jerrold equipment they had ordered and that this would come about not by a simple refusal to sell to them but through Wescoast's refusal to buy because it did not want to accept the "bitter pill" tie-in of the service contract.[9]

Hamlin made this very clear in his testimony at the trial. Asked as to what was the "double purpose" behind the writing of the letter to Wescoast advising as to the necessity of the service contract as a condition for receipt of Jerrold equipment, he said that writing the letter as he did would in his opinion at the time "resolve the conflict in Wenatchee, because in my opinion, Mr. Jones would not accept the maintenance and service contract." He testified that all these matters and the objectives of this notification to Wescoast had been discussed with Tucker and Brown prior to the sending of the letter. That these objectives were accomplished is indicated in a letter from Hamlin to Tucker dated April 6, 1953, in which Hamlin said "KPQ Wenatchee, our competitor, has chosen to abandon Jerrold equipment rather than sign a Jerrold Maintenance and Service Agreement. They state they will make their own equipment. Of interest is their further observation that this will 'delay them considerably.'" As will shortly appear these maneuverings by the defendants accomplished not only delay but complete frustration for Wescoast.

The facts show what was in substance a refusal to let Wescoast have Jerrold equipment. Plainly defendants' object was to see to it that Wescoast should not get the equipment under any circumstance, not even by signing a service contract. That this was done with a view

---

might allege that Jerrold equipment had been improperly installed.

8. The letter went on to suggest that the service contract could be sold to the purchasers in a much more attractive manner if emphasis were placed upon the benefits to the operator of the system rather than merely emphasizing Jerrold's desire to avoid lawsuits. This letter was written in response to one received by Merritt from Jerrold in which the same thought was expressed as follows: "On the letter to Mr. Jones over Phil's signature, it is my understanding from our conversations that this letter was written in the terms that it was for reasons other than those that appear on the surface. Even under such circumstances, it is inadvisable, it seems to me, to indicate that the major reason for the Service Contract is for Jerrold to protect itself against suit."

9. In Merritt's letter of April 14, 1953, to Jerrold, mentioned above, he stated "You will have to admit that the service contract in its present form is a very bitter pill."

to setting up the town for the development of a rival system of the Whitney-Shapp interests seems clear. It also seems clear that Whitney was participating in this plan of putting obstacles in the way of Wescoast so that it could take over the construction of the community television antenna system in Wenatchee. Hamlin testified at the trial as follows: "Mr. Brown [representing Whitney] was very, very concerned about Jerrold equipment already known by him to be in the hands of the KPQ system, the opposing system, and he imposed upon me as a condition of his recommending Wenatchee that I assure him that the opposition would not get Jerrold equipment. I told him that the only assurance I could give him was my foreknowledge that Mr. Jones was not going to sign the Maintenance and Service agreement, and that I felt that this was a very strong reason for his not being concerned about the opposition having Jerrold gear." [10]

At about the same time, the Jerrold-Whitney group formed a corporation to construct the contemplated community television system in Wenatchee. This corporation was named Wenatchee Television Cable Corporation. Brown of Whitney was president, Hamlin was vice-president, and, as previously indicated, the stock was divided between Shapp and Whitney with the latter having 75 percent and Shapp and his designees 25 percent.

It was known (and the fact is conceded) that in view of its size and population Wenatchee would not support more than one community television system of the kind then being contemplated. Wescoast, being unable to procure Jerrold components, was obliged to look elsewhere for substitute parts and was being considerably delayed. As soon as

the Jerrold-Whitney corporation was formed it entered upon an advertising campaign announcing that its system would be constructed within six to eight weeks and that it would be built with the superior Jerrold equipment which supplied 80 percent of community antenna systems in the country. Brown, representing the Whitney interests, had gone to Wescoast and indicated that the Whitney people were coming into Wenatchee to compete. Jones of Wescoast got the same information from Shapp. Shapp and Whitney indicated to Jones that the Shapp-Whitney interests "had all the money in the world and knew more than anybody else in the world and we had better shut up, leave them alone and go fishing."

That these efforts to talk Wescoast out of contining in business in Wenatchee were pursuant to a general, area-wide plan and arrangement between the Jerrold-Whitney, Hamlin, Merritt groups, is indicated by other evidence in the record. Thus the witness McCaw, who in 1953 had received a franchise for the construction of a community television system in Walla Walla, which was one of the cities toward which the Jerrold-Whitney interests were looking, had attempted to get some equipment for the construction of his contemplated system and in that connection had a conversation with Hamlin. Hamlin told McCaw that such equipment would not be available to McCaw from Jerrold suppliers unless McCaw entered into a service contract with Jerrold and unless he agreed to use Jerrold equipment exclusively. At that time Hamlin said to McCaw that "unless we did enter into this agreement with them, that they would see that a competitor came in and got into competition with us, and used the name of J. H. Whitney & Co." McCaw did not acquire Jerrold equipment and Whit-

10. About this time Video Associates, Inc., which had been operating as distributor for the Jerrold equipment in the Northwest, was replaced by Jerrold-Northwest, as previously indicated, Jerrold having 65% of the stock, the remainder being owned by Hamlin and Merritt; Shapp, president of Jerrold, became president of Jerrold-Northwest, and Hamlin and Merritt also became officers of the company.

ney entered the area with the contemplated system.

McCaw also attempted to install a community television system in the Richland-Kennewick-Pasco area about the second quarter of 1953. He was one of three stockholders in a corporation organized for that purpose. They started construction of their system and attempted to purchase equipment from Hamlin, seeking Jerrold equipment, and Hamlin again stated that "unless we signed a service contract with Jerrold and agreed to all of its terms and conditions, that no equipment would be available to us." Again this witness testified that Hamlin threatened that if McCaw and his group would not sign the service agreement "that they would bring in J. H. Whitney & Co. to compete with us, which they did." The result was that McCaw and his group stayed in Pasco and Kennewick and the Whitney group constructed in Richland, although all three places could have been served by a single system.

Correspondence in the record indicates that similar competition from an "eastern financial group" was threatened in communications to local operators in the Livingston-Bozeman area of Montana. The record indicates that in this case the Bozeman-Livingston parties reached an agreement with the Jerrold-Whitney interests upon a cooperative arrangement whereby Jerrold equipment would be used in that area, and that this arrangement was the result of threats similar to those previously mentioned.

In Wenatchee, Wescoast was making an effort to complete its system by constructing cables and making connections with prospective customers, but because of delays incident to its inability to procure the equipment which it had vainly tried to procure from Jerrold, it finally reached the point early in 1954 where it had covered but one-third of the town while the rival Jerrold-Whitney concern, Wenatchee Television Cable Corporation, (whose name was changed to Consolidated Television Cable Corporation, here called Consolidated), had completed . a system covering the entire town.

The evidence shows that Wescoast had been delayed for a period of months by having its anticipated supply of Jerrold equipment cut off. It was dealing with other manufacturers but it was impossible to procure suitable equipment from them on time. Because of this delay Wescoast was finding it increasingly difficult to sign up customers who were being attracted to the Consolidated system because of the latter's rapid development which was the result of its more abundant financial resources and its access to Jerrold equipment.

It was then, early in 1954, that Wescoast despaired of being able to continue the struggle. Among other difficulties was the threat of a rate war through Consolidated's proposals to make connections for customers without charge. Wescoast had counted on receiving connection charges from customers in order to finance the completion of its system. It was simply short of money.[11] Wes-

11. Defendants and their associates kept a sharp lookout for Wescoast's increasing difficulties. On June 18, 1953, a Whitney inter-office memorandum noted of Wescoast that "This group has only one connection thus far and being unable to buy Jerrold equipment, is planning to use Telemeter or other untried equipment," and that its quality of construction was "extremely poor." On August 7, 1953, Whitney wrote a lengthy letter to a Wenatchee Television set dealer explaining the great superiority of the Whitney-Jerrold system over the compet-

ing system, suggesting that the latter cannot "be operated successfully as a tag-on to some other business," evidently referring to Jones' and Wallace's radio station. On October 16, 1953, Brown wrote his attorneys at Wenatchee inquiring whether he could find out where Jones had obtained some money the latter had "obviously obtained to complete his system." On November 9, 1953, Petersmeyer of Whitney wrote to Brown: "It sounds as though your friend [Jones] is running out of steam."

coast and Consolidated then began negotiations which finally resulted in Wescoast selling out to Consolidated.

The plaintiff's theory respecting damages was that this sale had been forced by the wrongful acts of the defendants and that in consequence plaintiff had been damaged to the extent that the fair value of its assets exceeded the sum which it had received on the sale. The question of proof of damages and the proper measure thereof will be discussed hereafter.

 Upon this appeal it is asserted by the appellant that Wescoast's giving up its project to Consolidated was not actionable because that sale was not caused by Wescoast's needs for Jerrold equipment, and that the defendants' conduct was not the proximate cause of such sale. It is further asserted that there was no antitrust violation; that the insistence of the defendants on a tie-in of a service contract was reasonable and fully justified; and that there was no proof of an attempt to monopolize and no evidence of a conspiracy to restrain trade.

When we consider the evidence in this case in the light most favorable to the prevailing party, as we must do, we are convinced that we have here an abundance of evidence of antitrust violations on the part of the defendants. With respect to the alleged conspiracy in restraint of trade we think the evidence discloses clearly a concerted refusal on the part of Jerrold, Shapp, Jerrold-Northwest, Hamlin and Merritt to sell Jerrold equipment to Wescoast, or concerted action to see to it that Wescoast did not purchase such equipment, in which conspiracy Whitney participated. As was stated in Klor's v. Broadway-Hale Stores, 359 U.S. 207, 212, 79 S. Ct. 705, 709, 3 L.Ed.2d 741, "[C]oncerted refusals by traders to deal with other traders have long been held to be in the forbidden category", that is to say, "un-

duly restrictive, and hence forbidden by both the common law and the statute."

Another respect in which the conduct of the defendants appears to have been a deliberate undertaking to accomplish illegal results, and to restrain trade, was the use of the device of a tie-in of a service contract.[12] Jerrold, as we have noted, had a dominant position in the business in which it was engaged in the marketing of community television antenna systems, the relevant market here. It was dominant not merely because of the volume of its business, or because the vast majority of all such systems had been equipped with Jerrold components, but also because some of the equipment vital to such a system was exclusively available through it, such as the AGC components previously mentioned. This actual dominance was specifically apparent in the case of the dealings with Wescoast for the latter was delayed for a period approaching six months in getting its system under way because it could not supply its needs elsewhere.

 There are a substantial number of decisions which hold that such tie-in agreements "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." Northern Pac. R. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. As stated in International Salt Co. v. U. S., 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20, such arrangements which foreclose competitors from any substantial market are per se unreasonable because they "tend to create a monopoly."

The trial court did not rule that the tie-in arrangement was per se a violation of the Act as the cases just cited

---

12. The evidence also indicates that the defendants attached to sales of Jerrold equipment a further requirement that television antenna stations use exclusively Jerrold equipment.

might have authorized it to do.[13] The court's instruction to the jury on the tie-in problem was as follows: "Now, it is presumed to be a violation of the antitrust laws for a seller to refuse to sell a product except on the condition that the buyer also purchase from the seller some other product, or service, which the buyer does not want or need, where the effect is to substantially lessen competition. Such an agreement may be legal, however, if the seller proves that there was a bona fide and reasonable business necessity for selling his product only with another product or service." The court also charged the jury as follows: "If you find that the defendants were justified in their policy of the sale of systems only with a service contract, it did not constitute an unlawful combination or conspiracy for them to make that policy effective by obtaining the cooperation of their employees and others who were handling their equipment."

The record here is replete with evidence to warrant the jury in finding that the defendants wholly failed to prove a bona fide or reasonable business necessity for the tie-in arrangement or that the same as practiced here was reasonable. There was evidence to warrant the jury in finding that Jerrold was unable to furnish the engineering services called for in its service contract. Thus, on November 4, 1953, Merritt wrote to Jerrold, referring to the service contract and the form thereof submitted by Jer-

rold, and complained that "you promised a lot of things which you have not delivered—or to sell the contract forced us to promise a lot of things which we could not deliver because you never made them available—except on a conversational basis. We refer specifically to those services outlined in Paragraph F of your new agreement." He complained that what was promised in the contract should be made "available in concrete form rather than on a conversational basis." Apparently Hamlin and Merritt themselves felt at the time that the tie-in of the service agreement was unreasonable. Hamlin, testifying, stated that he had objected to Shapp about requiring the service agreement: "A. Well, it was my feeling and that of Mr. Merritt that we should not enter into a sales program trying to enforce the maintenance and service agreement. We felt that it was unworkable in this area and we objected to it. We were finally persuaded by Mr. Shapp to go ahead with it, but it's a matter of record in all of the correspondence that took place at that time that both Merritt and I were against it in so far as the intercompany dealings were concerned. Externally I think anyone will tell you that we sold it vigorously. Q. What were the reasons as to why you opposed the policy of the Jerrold service contracts? A. The first was sales resistance. The second was the feeling that it was unenforceable. And the third was that it would be difficult to administer and properly service with the personnel we had on hand."

13. It is assumed that the trial court may have refrained from giving a stronger instruction as to the effect of the defendants' insistence upon the execution of a service contract as a condition to the purchase of Jerrold equipment because of certain language used by the court in United States v. Jerrold Electronics Corp., (D.C.E.D.Pa.) 187 F.Supp. 545 (1960) (affirmed Per Curiam 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806). In that case the United States sought to enjoin Jerrold from acts in violation of §§ 1 and 2 of the Sherman Act. The court found that Jerrold and Jerrold-Northwest did attempt to create a monopoly in the market for community television antenna equipment in the states of Washington, Idaho and western Montana, and enjoined those defendants from refusing to sell any item of Jerrold equipment because of a requirement that the purchaser subscribe to Jerrold's services. In the earlier case, however, the trial court expressed the view that Jerrold's tie-in arrangement was, when first initiated, reasonable. No effort is made in this case to assert that the judgment in that action brought by the United States was prima facie evidence against the defendants here.

It was the theory of the defendants that the requirement of a service contract was primarily to make sure that after the installation of the antenna system it would continue to function properly; that if something went wrong after the installation this would hurt the good name of Jerrold, and to make sure that this result would not occur, Jerrold felt that a service contract was essential. There was, however, evidence to indicate that such was not necessarily the primary purpose of the contract. Hamlin testified that in conversation with Shapp he had learned that one purpose of the sale contract was to control sales and also to give Jerrold an additional and continuing share in the proceeds of the system. According to Hamlin he had learned that Shapp felt that if the system was a success Jerrold should get a continuing revenue from its operation. This would be accomplished because under the service contract payments for the service would be continued during the period of the system's operation, and thus Jerrold would share in the "after profits that their engineering had made possible;" and also "to permit them to participate in the after profits of the system," a method of getting an additional financial return.

Under all these circumstances the jury under the instructions stated above, to which no objection was taken, could well find that there was a total failure to establish the reasonableness or other justification for the tie-in arrangement. In consequence the fact that the tie-in was insisted upon would constitute further proof of an illegal combination in restraint of trade.

In attacking the judgment below, appellants undertake to examine separately each of the acts done by the defendants and to argue that each such act, so viewed, can be defended as entirely legal conduct. Thus it is argued that the mere fact that Jerrold was successful in producing a useable antenna system which operated successfully and commanded approval from purchasers was no evidence of a violation of the antitrust laws. Then it is said that if Jerrold or Shapp chose to organize enterprises for the development of community antenna systems in various communities that also would be no evidence of antitrust violations. Then it is contended that even if the service contract arrangement was designed to provide additional compensation to Jerrold on the sale of its systems, that would be no wrong for one who has something to sell has the right to fix a price at any sum he chooses. Again it is argued that if the Whitney-Shapp group chose to enter Wenatchee or any other city for the purpose of going into competition with a rival community television enterprise, such proposed competition was in no sense evidence of any antitrust violation.

The difficulty with this approach is that it fails to take into consideration what really happened here, which is, that a powerful group of business concerns and their subsidiaries set up a scheme by which they excluded potential competitor concerns like Wescoast from access to a supply of vital materials. "[I]t is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." Continental Co. v. Union Carbide, 370 U.S. 690, 707, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777. The Shapp - Jerrold - Whitney - Hamlin - Merritt group had sufficient command over these essential components to be able to impede and exclude new entrants into the market. We have here the sort of thing which Mr. Neale describes under the heading of " 'Bottleneck' agreements which deny scarce facilities to competitors." [14] Here Wescoast was excluded from any practical access to the necessary facilities in a manner comparable to that which was described in Associated Press v. U. S., 326 U.S. 1, 65

14. Neale, The Antitrust Laws of the United States of America, 1960, pp. 68–72, and see also the discussion of "Collective exclusive-dealing agreements" pp. 66–68.

S.Ct. 1416, 89 L.Ed. 2013. Cf. Standard Sanitary Mfg. Co. v. U. S., 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107, and Montague & Co. v. Lowry, 193 U.S. 38, 24 S. Ct. 307, 48 L.Ed. 608

We think that the proof of a combination or conspiracy in restraint of trade was ample here. There was also evidence of an attempt to monopolize the market on the part of the defendants. A relevant market here would be made up of those cities in the Northwest which we have previously mentioned. Originally Video Associates, operated by Hamlin and Merritt, were the distributors of Jerrold equipment in that area, but during the period here involved Jerrold-Northwest, Inc., defendant here, was organized as previously indicated, giving Shapp, the dominant owner in Jerrold, a share in the profits of the distribution of Jerrold equipment in this area. Then to round out the Jerrold-Shapp complete control of the anticipated antenna systems the Whitney-Shapp arrangement was made. A fair inference from these facts must be that these parties were thus undertaking to see to it that they controlled the community television systems in these areas all the way from the manufacture of the components through the distribution thereof and down even to the construction and operation of individual systems within the cities named. This monopoly power was, as we have seen, utilized to see to it that Wescoast could not successfully enter this market or maintain any competition with the monopolizers.

This brings us to the question of whether, as claimed by the appellant, there was insufficient proof that the plaintiffs suffered damage as a proximate consequence of the acts of the defendants. We have previously indicated some of the consequences which befell Wescoast when it found itself unable to acquire Jerrold equipment. We have noted that Wescoast had limited financial resources and that when it entered Wenatchee and began the construction of its antenna system it was counting on financing the construction in part from the charges which it made to individual users of the system when connecting cables to their homes. When the competition from the Whitney-Shapp system held out the threat of a rate war through the latter's giving connections to customers without charge, Wescoast despaired of relying on this anticipated income for its necessary financing. In consequence of the situation in which Wescoast had been placed through the circumstances which we have previously described, Wescoast agreed to sell. The testimony indicates that they had no way out. As Wallace testified: "I felt better that we lose a battle than lose the whole war." [15]

15. Wallace testified as follows: "Q. Why was the decision reached by Mr. Rogan Jones and wife and Mr. Wallace to sell the system to the Wenatchee Television Cable Corporation? A. They refused our offer of $25,000 to pick up and take their equipment and salvage and leave. This was all we felt we could offer. It was more than we had, and we had asked five or six of our long-time business suppliers, specifically, Graybar, P.U.D., General Telephone, Mid-State Radio, Wells and Case Hardware, to give us a line of credit up to $10,000, nothing in writing. It was given but we had used up, in almost every case, our agreement, gentlemen's agreement, that we wouldn't draw over that on them and our bank balance was zero-zero. More important, the over-all was that the president, Rogan Jones, the principal stockholder, was building broadcast television for Bellingham and he too assured me that he was in the same spot I was, that he needed money to keep the television operation there. We were holding KVOS' note at KPQ, Wenatchee, for more than $50,000, which had been pledged, and which he could not borrow more with that note outstanding.

"As a second consideration, I myself had put in my insurance. I had borrowed against my insurance, against my home, all that I could borrow against my few stocks that I owned. I had every financial asset I had pledged for borrowing to keep operating. The financial statement will show that our income from the sale of connections was adequate, possibly, to keep going, but if our source of capital return was cut off in a rate war of giving connections away, I was all done,

We think that the evidence here would justify the jury in believing that in consequence of the acts and conduct of the defendants Wescoast had been driven to its knees and finding no other way out had agreed to sell for an agreed price of $50,000, reserving the right to salvage some of its equipment. The salvage produced $18,739.91. The evidence showed Wescoast's net investment in its system to have been $189,984.45. There was evidence to show the fair market value of its properties to be in excess of that sum; but subtracting the amounts received from the amount last mentioned would indicate out-of-pocket loss of $121,254.54, considerably in excess of the jury's award. We are unable to perceive any reason for a contention that there was lack of proof of damage or of the amount thereof.

For the reasons which we have here detailed, we find no basis for appellant's contention that the court should have directed a verdict in its favor.

Appellants further list certain conduct of the trial court which it is asserted constituted error and grounds for reversal and an order for new trial. We have examined all of these contentions and find them without merit.

The first such contention made is that the court erred in reading a statement to the jury at the outset of the trial advising the jury as to the nature of the case which was about to be tried and of the issues which it was anticipated would be present. It is argued that this was a flagrant violation of the provisions of Rule 51, Rules of Civil Procedure which provides that the jury shall be instructed after the arguments to the jury had been completed. At the conclusion of the evidence, the court, as the rule requires, informed counsel on their proposed requests for instructions which had been made by counsel, and after argument to the jury had been concluded the court then instructed the jury fully as to the issues involved and with respect to the matters to be determined by them. We are unable to perceive in what manner the court's earlier outline of the case at the beginning of the trial could have been prejudicial to the defendants, and appellants have not furnished any satisfactory explanation as to why they think they were prejudiced by this procedure.

One of the persons called on the jury was an agent for the F.B.I. who in the past had investigated violations of antitrust laws. On examination by the court this juror expressed the view that this circumstance would not in any way prejudice him in this case and he thought he could be fair to both sides. The juror was challenged for cause by the defendants, whereupon the court indicated that he did not think the juror was disqualified by what he had said, and stated to defendants' counsel: "I will give you the opportunity of making further inquiry if you think you can establish it." Counsel did not make further inquiry. Under the circumstances we are of the opinion that the court's action in declining to excuse this juror disclosed no error.

It is argued that certain evidence as to value was inadmissible. We find no merit in this contention. Again it was contended that the court improperly admitted certain exhibits, to one of which we have previously alluded, making certain threats against television competitors at Livingston and Bozeman, Montana. It is argued that these should not have been admitted because they occurred more than a year after the dates when defendants were dealing with Wescoast. Actually they occurred about a month after Wescoast sold to the Whitney-Shapp corporation. The evidence

and would go down the drain, not I personally, but the company, more important. I fought right down to the last minute, but, more important, the final decision was that you must be loyal and my business associate had a venture on which we

could make it. There was no competition in the television broadcasting business in Bellingham. I had encouraged him to go into the business there, and I felt better that we lose a battle than lose the whole war. I agreed to sell."

was admissible for the reason stated in Girardi v. Gates Rubber Company Sales Division, Inc., 9 Cir., 325 F.2d 196, 203.

It is argued that the court should not have charged the jury with respect to monopoly. What we have previously said as to proof of monopoly sufficiently answers this contention.

As to the further argument that the court's instructions on conspiracy in restraint of trade were unduly repetitive, we think the contention wholly without merit. Furthermore, the record fails to show that in objecting or taking exception to the instruction referred to, counsel complied with the requirement of Rule 51 F.R.Civ.P. which requires counsel to state "distinctly the matter to which he objects and the grounds of his objection."

Complaint is made that the court should have given a requested instruction telling the jury that they should determine whether there had been "any significant effect upon the movement of goods in interstate commerce." This instruction was properly rejected both because, as earlier in this opinion it is indicated, the interstate character of the commerce here involved had been stipulated and because the evidence conclusively showed that the amount of interstate commerce here was substantial.

In making its case the plaintiff introduced voluminous correspondence and other documents exchanged by or written by the defendants or some of the persons collaborating with them. Some portions of this correspondence contained statements contrary to the allegations of the plaintiff's complaint and of contentions made by it in pretrial order. It is contended that because this evidence was offered by the plaintiff these various contradictory statements are binding upon the plaintiff. We know of no such rule. To the extent that documents originally designed to serve the defendants and their purposes also contain statements which support the claims of the plaintiff, the plaintiff may rely thereon without having to accept as verity all that appears in such documents.

In like manner some of the witnesses for the plaintiff on occasion appeared to contradict themselves. All of these matters and the significance to be attached thereto present issues properly to be determined by the jury who are the sole judges of the weight and credibility thereof.

Since we find no error in this record, the judgment is affirmed.