**CATALINA CABLEVISION ASSOCIATES a joint venture, Plaintiff-Appellee,**

**v.**

**CITY OF TUCSON, Defendant-Appellant.**

No. 83–2460.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 1984.

Decided Oct. 25, 1984.

designation.

John A. Baade, Miller & Pitt, P.C., Tucson, Ariz., for plaintiff-appellee.

Bradford C. Detrick, Frederick S. Dean, Thomas J. Wilson, Tucson, Ariz., for defendant-appellant.

Robert J. Logan, San Jose, Cal., for amicus curiae City of San Jose.

Before ANDERSON, SKOPIL, and POOLE, Circuit Judges.

POOLE, Circuit Judge:

Catalina Cablevision Associates ("Catalina") brought action against the City of Tucson, an Arizona Municipal Corporation, alleging that Tucson violated the Sherman Act, 15 U.S.C. §§ 1 and 2, by issuing one, non-exclusive license for cable television service in Tucson. The narrow question presented by this appeal is whether the "state action" immunity established in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), exempts the City's actions from challenge under the federal antitrust laws.

## I.

Catalina was formed for the purpose of developing and operating a cable television system within and around Tucson. It is a joint venture of an Arizona limited partnership (Catalina Cablevision, Ltd.) and an Arizona corporation (TCID), which is a wholly-owned affiliate of Tele-Communications, Inc., a Delaware corporation.

In 1974, the Arizona legislature enacted Arizona Statutes §§ 9–505 through 9–508,[1] which authorize counties and incorporated municipalities to regulate and license cable television systems. In 1980, Tucson enacted its Cable Communications Code. Shortly thereafter, in November, 1980, a Request for Proposals was nationally advertised. The Request stated that Tucson intended to issue one, non-exclusive license for cable television service, and that it reserved the right to grant one or more additional non-exclusive licenses at any time.

After receiving proposals from ten companies, and holding public hearings, Tucson granted a 15-year, non-exclusive license to Cox Cable on December 7, 1981. Catalina also demanded a license, but the Tucson City Council voted to reject Catalina's demand. Catalina filed this action under the Sherman Act on July 26, 1982, alleging that the City was acting to restrain trade, 15 U.S.C. § 1, and had created a monopoly, 15 U.S.C. § 2.

In its answer to Catalina's complaint, Tucson asserted *Parker v. Brown* immunity from suit. Catalina moved to strike the immunity defense. At oral argument the district court treated Catalina's motion to strike as one for partial summary judgment and permitted the City to file a cross motion for partial summary judgment. The district court ruled in favor of Catalina holding against immunity, but certified the order as involving a controlling question of law open to difference of opinion. We then accepted the City's interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## II.

In *Parker v. Brown*, the Supreme Court established that states, acting "as sovereigns," are immune from liability under the Sherman Act. The Court reasoned that

---

1. See the pertinent text page 1268, post. A subsequent amendment to the statute, Ariz.Rev.Stat. §§ 9–509—510 (Supp.1983–1984), is not relevant to this appeal.

nothing in the language of the Sherman Act suggested a purpose to restrain state action, and that under the constitutional dual system, embracing both federal and state sovereigns, it would not attribute to Congress an unexpressed intent to restrict state authority.

*Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (plurality opinion), advanced the view that political subdivisions of states are entitled to the "state action" immunity when their actions are taken pursuant to a "clearly articulated and affirmatively expressed state policy to displace competition with regulation or monopoly service." *Id.* at 413, 98 S.Ct. at 1137.[2] That case involved a tie-in contract whereby the City would not sell gas and water to customers outside of city limits unless they purchased their electricity from the City. The Court held that Lafayette was not entitled to immunity unless it showed that the tie-in scheme was the kind of action "contemplated" by the state legislature. *Id.* at 415, 98 S.Ct. at 1138.

More recently, in *Community Communications, Inc. v. Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Court has provided clarification of the scope as well as the limit of state action immunity as extended to political subdivisions. The City of Boulder, Colorado, had enacted a moratorium on the expansion of a cable television system pursuant to a general grant of "home rule" authority in the Colorado Constitution which gave cities the power of self-government in local matters. The Court found that Colorado's policy with regard to Boulder's alleged anticompetitive acts was one of "mere *neutrality*," and that there was no clear articulation and affirmative expression of state policy authorizing the City's action. The Court stated that the legislature could hardly have "contemplated" the challenged action

where it did not even affirmatively address the subject being regulated. *Id.* at 55, 102 S.Ct. at 842. *Boulder* holds that a general grant of power to enact ordinances does not necessarily imply state authorization to enact specific anticompetitive ordinances. *Id.* at 56, 102 S.Ct. at 843.

Recently in *Golden State Transit Corp. v. Los Angeles*, 726 F.2d 1430 (9th Cir. 1984), we have summarized the rules governing "state action" immunity. To establish that an action is taken pursuant to a clearly articulated and affirmatively expressed state policy the state subdivision must show 1) "the existence of a state policy to displace competition with regulation," and 2) that "the legislature contemplated the kind of actions alleged to be anticompetitive." *Id.* at 1433.

### III.

Our questions are whether the Arizona statute is a clearly articulated expression of state policy to displace competition with regulation, and, if so, whether the issuance of a nonexclusive license for cable television service was the kind of action "contemplated" by the Arizona legislature. *Golden State*, 726 F.2d at 1433.

The district court held that Tucson was not entitled to *Parker v. Brown* immunity because the Arizona statute was no more than a general grant of authority like the Home Rule Amendment in *Boulder*, and Arizona law expressed no policy favoring anticompetitive acts by cities. We disagree.

The Arizona statute is far more specific than that in *Boulder*. The cities' authority to regulate cable television systems under the Arizona statute is express. It reads:

Authority to issue license.

A. For the purpose of authorizing and regulating the construction, operation and maintenance of cable television sys-

---

2. The "active state supervision" requirement for state action immunity as set out in *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), need not be addressed here as the district court did not rule on this basis. Moreover,

*Golden State Transit Corp. v. Los Angeles*, 726 F.2d 1430 (9th Cir.1984), held that municipalities, as distinguished from private parties, need not be under active state supervision to qualify for state action immunity. *Id.* at 1430.

tems, the licensing authority of a city or town for an incorporated area, or the licensing authority of the county for unincorporated areas, either individually or jointly by intergovernmental contract, may issue a license to any person to use public streets, roads and alleys, and shall impose conditions, restrictions and limitations upon the use of such public streets, roads, and alleys, and upon the construction, operation and maintenance of cable television systems.

Ariz.Rev.Stat. § 9–506A.

The language of this enactment is clearly more far-reaching then was the case with the Colorado grant of authority. We must nonetheless still decide whether the Arizona statute is sufficiently specific to satisfy the *Lafayette* test of clear articulation and affirmative expression.

*Lafayette* provided some guidance in making this determination. It provides that a municipality need not point to "specific, detailed legislative authorization" before it can properly assert its immunity. 435 U.S. at 415, 98 S.Ct. at 1138. State authorization for the challenged action, fairly and reasonably deemed to have been within the legislature's contemplation, is sufficient. This Circuit has held that the state need not "compel" political subdivisions to take specific action in order for the subdivision to be entitled to state action immunity. *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813, 823 n. 8 (9th Cir.), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). *See also Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 381 (7th Cir.1983), *cert. granted,* — U.S. ——, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984); *Century Federal, Inc. v. City of Palo Alto, California,* 579 F.Supp. 1553, 1558 (N.D.Cal.1984).

The specificity of the Arizona statutory scheme reflects an affirmative state policy to displace competition with regulation and satisfies the *Lafayette* requirement for state action immunity. First, § 9–506A grants licensing authority to the cities "for the purpose of authorizing and regulating the construction, operation and mainte-

nance of cable television systems." Second, in *American Cable Television, Inc. v. Arizona Public Service Co.,* No. 1 CA–CIV 6567 (Ariz.Ct.App. Dec. 1, 1983) (petition for review denied Feb. 23, 1984), the Arizona Court of Appeals held that Ariz.Rev. Stat. § 40–354, which provides that the Arizona Corporation Commission has no jurisdiction over cable television systems, is a clear indication that the legislature intended to grant municipalities the authority to regulate cable television. *Id.* at 15. Third, explicit statutory language of § 9–506A directs cities to restrict the construction, operation, and maintenance of cable television systems. The statute provides that the licensing authority

shall impose conditions, restrictions and limitations * * * upon the construction, operation and maintenance of cable television systems.

Ariz.Rev.Stat. § 9–506A. We conclude that these statutes provide a clear and affirmative expression of Arizona policy to displace unfettered competition in the cable television industry with regulation by political subdivisions of the state.

The remaining question is whether the particular action taken by Tucson—the issuance of a single non-exclusive license— was "contemplated" by the state. *Lafayette,* 435 U.S. at 434–35, 98 S.Ct. at 1147–48. We find that it was.

In determining whether the challenged action was contemplated by the legislature the Eighth Circuit looked to whether the action is a "necessary or reasonable consequence of engaging in the authorized activity." *Gold Cross Ambulance & Transfer & Standby Service v. City of Kansas City,* 705 F.2d 1005, 1013 (8th Cir.1983). *Accord Town of Hallie v. City of Eau Claire,* 700 F.2d at 381.

In granting the cities the authority to regulate cable television, the legislature was aware that cable television systems are much like telephone systems and gas and electric utilities which burden public streets and roads by requiring the installation of cables, wires, and pipelines. Accordingly, the legislature instructed the

**1270**

cities to place limits and restrictions on the use of public streets and roads. Ariz.Rev. Stat. § 9–506A. Clearly, a cable television license, unlike a driver's license, could not be granted to all qualified applicants. In fact, the licensing authorities have explicitly been directed to "impose conditions, restrictions, and limitations," on the construction and operation of cable television systems. *Id.* Thus the legislature necessarily contemplated that cities would limit the number of cable providers despite the anticompetitive effects that such action might have.

Catalina conceded at oral argument that the statute authorizes cities to limit the number of cable providers. Their argument is that the statute does not authorize the City to license just one provider while reserving the right to license others at will. Their argument is untenable. Any limitation upon the number of providers would necessarily constitute some restriction and that is precisely what the statute literally provides. Tucson has just begun to regulate cable television. It is not unreasonable for not licensing all service providers at once. After some experience gained with the first provider, the City may wish to reassess its needs and will be better able to anticipate problems not obvious at the outset. Caution in granting license to additional service providers, as other Arizona cities appear to have exercised, would seem to be the prudent course of action for the City to take. For example, the City of Phoenix issued a single license in 1976. Later, in 1980, it issued three additional licenses. The City of Paradise Valley issued its first license in 1975, and a second in 1980. The cities must be allowed a starting point. In enacting § 9–506A it is clear the legislature contemplated that the cities should have discretion to limit the number of licensees and to determine if and when additional licenses would be granted.

## IV.

The State of Arizona has provided a clear and affirmative state policy to displace competition in Arizona cable television service with regulation. Tucson, therefore, is entitled to immunity from challenges under the Sherman Act for its actions taken pursuant to Arizona's policy. The City's issuance of a nonexclusive license for cable television service is the type of action contemplated by the legislature and reasonably undertaken pursuant to its regulatory authority.

The judgment of the district court is REVERSED.