Martin T. BYRE, Plaintiff
and Appellee,

v.

CITY OF CHAMBERLAIN, a Municipal
Corporation, Defendant and Appellant.

No. 14090.

Supreme Court of South Dakota.

Argued Oct. 24, 1983.

Decided Jan. 16, 1985.

Paul Mueller, Chamberlain, for plaintiff and appellee; Philip Stoeckle, Chamberlain, on brief.

Ronald K. Miller of Miller, Miller & Sebastian, Kimball, for defendant and appellant; Steven J. Bucher of Miller, Miller & Sebastian, Kimball, on brief.

MORGAN, Justice.

The complaint in this action was amended and the only count which survived at the conclusion of the trial alleged a violation of SDCL ch. 37–1, South Dakota's antitrust law. The jury awarded the plaintiff, Martin Byre (Byre), $40,500 in actual damages and under SDCL ch. 37–1 they trebled that amount. The trial judge signed a judgment against the city of Chamberlain, South Dakota (City), which awarded Byre $121,500. City appeals under SDCL 15–26A–3(1). We reverse and remand.

City provided garbage service for the residents and businesses of Chamberlain until 1960 when problems arose and City was unable to provide sufficient or efficient service. At that time, the city commissioners asked Byre to operate the garbage service as an employee of City. Byre refused to work for City but contracted to purchase City's equipment and to provide garbage service for City's residents and businesses as an independent contractor. The 1960 contract between Byre and City was periodically modified between 1965 and 1978 in order to increase Byre's income. Byre operated the only garbage collection and disposal service within a thirty or forty-mile radius of Chamberlain.

Upon advice of counsel in March of 1978, Byre applied for city licenses for each of his three garbage trucks. Section 6 of City Ordinance 375 provides:

No person shall use the Streets or Alleys of the City of Chamberlain for the collection, removal or disposal of any garbage or trash without first having obtained a license to perform such services from the Commission.

In June of 1978, Byre sought to increase the garbage service rates charged by City in order to increase his gross income. He asserted that increased costs made it difficult for him to operate. City asked Byre to present his records, books, and an explanation of his costs so it could determine how much to pay him. Byre refused or failed to furnish this information and negotiations broke down.

In September of 1978, City made Byre a final offer of $44,000 per year, $1,400 more than Byre's original June request. Byre's son, who is involved in the family waste disposal business, testified at trial that Byre declined the $44,000 offer on October 23, 1978, because City failed to comply with the applicable bidding procedures set out in SDCL ch. 5–18.[1] On October 19, 1978, Byre announced in the local newspaper that beginning November 1, 1978, residential garbage would be collected on a contract basis only. The residents of Chamberlain were requested to sign and return a form that was included in the newspaper announcement if they desired Byre's service.

1. In a 1978 case, this court held that municipal contracts for the collection and hauling of garbage and other waste are subject to the competitive bidding procedure set out in SDCL ch. 5–18. *Northern Hills Sanitation v. Board of Com'rs.*, 272 N.W.2d 835 (S.D.1978).

On November 6, 1978, City attempted to provide garbage collection for all City residents through December 31, 1978, by offering Byre $3,000 if he would collect City's residential garbage in November and $3,500 for December's garbage collection. Byre refused this offer on November 14, apparently because City had again failed to comply with the bidding procedure set out in SDCL ch. 5–18.

Under this court's decision in *Northern Hills Sanitation v. Board of Com'rs.*, 272 N.W.2d 835 (S.D.1978), cities contracting for waste removal must comply with the bidding procedures set out in SDCL ch. 5–18. The city commission decided on November 20, 1978, to advertise for bids for the collection of all residential and commercial garbage and waste produced in City.

On November 23, 1978, Byre placed an announcement in the Chamberlain newspaper, which read:

Attention. Anyone who doesn't have their residential contract signed and sent to us by December 1 *will no longer have their garbage picked up.* Martin Byre and Sons. (emphasis added)

City announced that on December 1, 1978, the date upon which Byre's service to residents who were not contracted with him was to stop, City would collect the garbage. On December 1, 1978, City employees began collecting residential and commercial waste. City had no way of distinguishing at that time between Byre's customers and residents or businesses which had not contracted with Byre; consequently, City attempted to collect all the garbage.

Two bids were received in response to the November bid notice. They were opened at the December 4, 1978, city commission meeting and neither met the advertised bid specifications; consequently, City re-let the bid. The bid specifications, however, were changed to request a five-year contract instead of three, and to allow for an alternative bid price based on a percentage of gross revenues collected by City for garbage collection and disposal. The same two parties who bid the first time around,

Byre and the Stienfeld and Steckelberg partnership (S & S), bid again. Byre's second bid, like his first, did not meet the bid specifications. He attempted to reserve his contracted pick ups as private customers. On December 29, 1978, City accepted S & S's bid to collect the waste from city residences and businesses for eighty-three percent of City's annual revenues collected for waste collection and disposal.

At the December 29 meeting, Byre and his supporters submitted a petition to initiate a new ordinance to permit the private collection of garbage and to prohibit City from charging residents and businesses contracted with private garbage collectors. The city commission, on January 8, 1979, began to formulate its own modification of the city garbage ordinance. It directed the city attorney to modify the garbage ordinances to establish a dumping fee for private collectors who deposited waste in the city landfill. The city commission awarded S & S the bid on January 17, 1979, because the S & S bid was the only one that conformed to the advertised specifications. S & S began performing as City's contracted garbage collector on February 1, 1979.

On March 6, 1979, City residents adopted the initiated ordinance to prevent City from charging City residents and businesses for waste disposal services provided under contracts with private garbage collectors. The ordinance was retroactive to March 1, 1979. The city commission decided on March 19 to bill all city residents and businesses for waste disposal services furnished in December 1978 and January and February 1979 and to continue billing each resident or business until a signed private contract was filed with City. This decision was based upon City's interpretation of Ordinance 375. Section 9 of that ordinance reads:

The City shall make a charge of $6.00 per each quarter for the collection of garbage from each family domestic unit.... The City shall make a charge, to be determined by the Commission for each month to each place of business.... Such charge ... shall be noted on the

quarterly water bill of each unit and shall immediately become due and payable....

As a result of City's decision to comply with the literal meaning of the ordinance, some residents and businesses under contract with Byre were billed by both Byre and City for waste disposal services furnished by Byre during those three months.

When Byre delivered garbage collection contracts to City for his customers, City stopped billing contract customers for garbage collection after March 1, 1979. The garbage charges for December '1978 and January and February 1979 continued to appear on the quarterly water bills mailed to residents who had not paid City for garbage collection for those months. City ordinance required payment of all outstanding indebtedness prior to transfer of licenses and water service.

Byre filed a complaint against City and initiated this lawsuit on December 4, 1978. He predicated his damages on loss of one-half of the total Chamberlain garbage collection market and the start-up costs of a private landfill. After both sides rested their cases, the trial court dismissed all counts except the question of City's antitrust liability and submitted that to the jury. The jury awarded Byre $23,000 for lost profits, $17,500 for the costs of opening a landfill, and trebled the actual damages awarded, for a total award of $121,500.

City has appealed and raises five issues: (1) Whether City is immune from state antitrust liability when providing for waste collection and disposal; (2) whether City violated state antitrust laws by letting bids, contracting for waste collection and disposal and continuing to bill all city residents when City had issued a license to a private collector who had private contracts with some city residents; (3) whether an initiated ordinance, petitioned for by city residents to except residents who had contracted with a private collector from an ordinance requiring City to mandatorily bill all residents for waste collection and disposal, is a valid use of the initiative power; (4) whether it was reversible error to admit exhibits and testimony based on hearsay, speculation and self-serving time and motion studies, all of which demonstrated City's actions as evidence of Byre's alleged damages; and (5) whether, under the facts of this case, the trial court committed reversible error by failing to instruct the jury properly.

The first issue raises the question of City's immunity from state antitrust laws in its role as waste collector. Byre's announcement placed City in a dubious situation. The announcement clearly implied that garbage would not be collected from residents who did not contract with Byre. He apparently expected to break his connection with City and take advantage of his position as the only garbage collector in the market area in order to keep the entire market while simultaneously and unilaterally raising the monthly rate for garbage collection.

SDCL ch. 37–1, Restraint of Trade, Monopolies and Discriminatory Trade Practices, is taken directly from the Sherman Act, 15 U.S.C. § 1 et seq. SDCL 37–1–22 permits this court to use federal and other state court interpretations in our construction of SDCL ch. 37–1, provided those cases are based on similar antitrust statutes. The United States Supreme Court stated in *Parker v. Brown,* 317 U.S. 341, 350–1, 63 S.Ct. 307, 313, 87 L.Ed.2d 315, 326 (1943), that "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." The United States Court of Appeals for the Fifth Circuit later held in *City of Lafayette, La. v. La. Power & Light Co.,* 532 F.2d 431, 434 (5th Cir. 1976) *aff'd* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), that

[a] subordinate state governmental body is not *ipso facto* exempt from the operation of the antitrust laws. Rather, [the question is,] whether the state legislature contemplated a certain type of anticompetitive restraint.... It is not necessary to point to an express statutory

mandate for each act which is alleged to violate the antitrust laws. It will suffice if the challenged activity was clearly within the legislative intent.

The *Lafayette* Court also stated that a trial judge may ascertain from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of. *Id.*

Some state courts have noted that the *Parker* exclusion for state action is based on the principle of federalism and a general deference to acts by the sovereign states. This concept cannot be extended to a state-city relationship because a city is not a sovereign, but rather a creature of state statute. *See, Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). We agree with the Iowa Supreme Court that because of the similarity of language between the federal and state antitrust statutes and because of the legislative suggestion for interpretation found in SDCL 37–1–22, great weight should be given to the federal cases interpreting the federal statute. *Neyens v. Roth*, 326 N.W.2d 294 (Iowa 1982).

■ The test for exclusion under the *Parker* state action exemption, as applied to cities, requires that the action be clearly articulated and affirmatively expressed as state policy. *Community Communications Co., supra; Cal. Retail Liquor Dealers Ass'n v. Midcal Alum.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

In this case, City was operating under specific statutory authority, SDCL 34A–6–1 and SDCL ch. 9–32, which we find to be clearly articulated and affirmatively expressed. SDCL 34A–6–1 provides:

It is hereby declared to be the public policy of the state to regulate and control the collection ... and disposal of solid wastes in a manner that will protect the public health and safety, conserve our natural resources, enhance the beauty and quality of our environment, prevent air pollution or water pollution, and prevent the spread of disease and creation of nuisances. It is also declared that local and regional solid waste management systems be supported to the extent practicable for the efficient and economical development of such systems....

Article III, section 1 of the South Dakota Constitution empowers the state legislature to enact laws for the preservation of the public peace, health or safety. The legislature, in order to ensure the health and safety of the state's citizens, also enacted SDCL ch. 9–32, Sanitation and Health Measures.

■ SDCL 9–32–1 grants City the power to take necessary or expedient steps to promote health and suppress disease within the community. City is specifically empowered to collect and dispose of garbage and other waste material. SDCL 9–32–11. In the exercise of its power, City was statutorily permitted to acquire and operate equipment and dump grounds and to contract with one or more persons for the collection and hauling of garbage and other wastes. SDCL 9–32–11. Similar statutory grants of power for regulation of waste removal have been interpreted to permit municipalities to contract with private organizations for the exclusive right to collect and dispose of waste and to allow municipalities to provide this service exclusively themselves. *City of Hobbs v. Chesport Ltd.*, 76 N.M. 609, 417 P.2d 210, 213 (1966); 83 A.L.R.2d 819 (1978). Statutes and ordinances that deal with the collection and disposal of waste are health measures. *Id.* The statutes give municipalities the authority to exercise the powers conferred by law and to provide by ordinance the proper measures to preserve the health and welfare of the community. *Id.* The trial court below properly took judicial notice of the fact that a health hazard arises when garbage is not properly collected and disposed of. The right of municipalities to exclusively regulate this area has been upheld as a proper

exercise of the municipalities' police or other powers. *Id.* Whether or not City was statutorily compelled to act and the extent of City's *duties* under the South Dakota Code, or under our case law, are irrelevant questions under the facts of this case.

■ There is no doubt that under SDCL ch. 9–32 and SDCL ch. 34A–6 a municipality may restrain trade by granting one or more parties a substantial portion or even 100% of a city's garbage market. *See Springs Ambulance Service, Inc. v. City of Rancho Mirage,* 745 F.2d 1270 (9th Cir. 1984); *Catalina Cablevision Associates v. City of Tucson,* 745 F.2d 1266 (9th Cir. 1984). "Where a restraint upon trade or monopolization is the result of valid governmental action no violation of the Sherman Act can be made out." *Westborough Mall v. City of Cape Girardeau,* Mo., 693 F.2d 733, 746 (8th Cir.1982). This principle parallels the "state action exemption" and it applies to municipal action that furthers or implements clearly articulated and affirmatively expressed state policy. *Id.; Springs Ambulance Service, Inc., supra; Community Communications Co., supra.* SDCL ch. 9–32 and SDCL ch. 34A–6 clearly and articulately delineate the state's waste disposal policy and affirmatively set out the parameters of City's power. City has historically furnished waste disposal services. The effective city ordinance, No. 375, was adopted in 1974 and was apparently an amendment of an earlier ordinance, No. 352. Furthermore, during a period of nearly eighteen years under the forerunner of those ordinances City had handled the garbage problem by contracting for pick up and by operating its own dump. The trial court instructed the jury that such ordinances have the force and effect of law.

■ When Byre publicly announced that after December 1, 1978, he would not collect waste from city residents who were not contracted to him, he breached his 1960 agreement with City by anticipatory repudiation. City was free to contract with one or more parties for the collection and disposal of waste and to charge and collect from every residence and business without sub-

jecting itself to the antitrust laws. *See* SDCL 9–32–11.

Based on the foregoing, the trial court properly instructed the jury:

You are instructed that every municipality shall have power to collect and dispose of and regulate the manner of handling of garbage and other waste material and for such purpose to acquire, establish, maintain, operate and regulate equipment and garbage disposal plants, incinerators and dumping grounds and to fix and collect chrages (sic) for such services, and to contract with one or more persons for the collection and hauling of garbage and other waste material from the municipality or districts established therein.

You are instructed that a municipality which lawfully complies with the preceding paragraph does not violate the antitrust laws.

The court further properly instructed:

Every municipality in the State of South Dakota has the power to enact, make, amend, reissue, or repeal all such ordinances and regulations as may be proper and necessary to carry into effect the plenary power granted to it by the State Legislature. The South Dakota Legislature has granted to every municipality the power to collect and dispose of garbage, regulate the manner of handling garbage with the city, and to fix and collect charges for such services.

You are instructed that when a municipality passes ordinances regulating garbage collection and the charges to be collected therefor, the said ordinances have the force and effect of law.

Byre has not challenged either of these instructions by notice of review. They are therefore the law of this case and not subject to review.

■ The second question thus becomes whether City, by its official acts or by conduct of its officers, agents, and employees, exceeded its state action exemption, and thereby subjected itself to the antitrust laws. The initiated ordinance, passed on

March 6, 1978, and designated Ordinance 416, was made effective retroactive to March 1. Under SDCL 9–32–11, City's ordinances and the "state action exemption," City could have lawfully monopolized the Chamberlain waste removal market up until March 6, 1979.

Ordinance 416 expressly permitted private contracting for garbage collection and prohibited City from charging residents who were privately contracted. After that date, any official actions by the city commission or any acts by city employees while in the scope of their employment that prevented Byre from running his business or restrained his trade and were the product of a conspiracy may trigger liability under SDCL 37–1–3.1. City may also be liable under SDCL 37–1–3.2 if, after March 6, 1978, the city commission or city employees acting within the scope of their employment monopolized, or attempted to monopolize, or conspired to monopolize the waste removal market in Chamberlain.

City, prior to December 1, 1978, monopolized the garbage service market. Byre was merely a contractor obligated to pick up the garbage and deposit it in the city-owned dump. Byre furnished the equipment, labor and gas and received a set amount of money per month in payment thereof.

When Byre decided to become an entrepreneur and strike out on his own to furnish garbage service to the businesses and residences of Chamberlain, he had no vested right in the market. The evidence at trial indicated that there were approximately six hundred customers. Byre secured contracts to service approximately one-half of that market. According to Byre's advertisement in the Chamberlain newspaper, the other one-half would have been without waste removal services after December 1 if City had not decided to stay in the waste removal business.

In effect, City replaced Byre with another contractor in order to preserve the pickup service it had furnished for eighteen years. Byre contends that even though City was authorized to continue contracting

for pick up, the City's specific actions were, in this case, outside the limits of its authority, and that such actions evidenced a conspiracy to ruin him and drive him out of business by monopolizing the city garbage market.

Byre first claims a nefarious alteration of the specifications between the first and second bid lettings. He contends that the alteration was the result of S & S's bank loan. Gary Busack, the bank loan officer and the City Garbage Commissioner, processed the loan. As previously noted, neither Byre nor S & S met the specifications of the first bid notice. Two changes were then made in the bid specifications, the term of the contract was changed from three to five years and the opportunity to submit an alternate bid for a percentage of the City's garbage revenue rather than a flat monthly payment was added. Byre's bid again failed to meet specifications. S & S was the successful low bidder on the second letting. Byre's claim of illegality points to Busack's position as the bank loan officer who handled S & S's loan and as the garbage commissioner who changed the bid specifications from three to five years to coincide with the term of S & S's bank loan. Byre suggests this is in violation of SDCL 6–1–1, which prohibits "any officer of a ... municipality ... to be interested, either by himself or agent, in any contract entered into by said ... municipality[.]" We disagree.

First of all, Byre would stretch the application of the statute far beyond its specific plain language. The garbage collection contract was between City and S & S. The loan was between Bank and S & S. Busack had no direct connection with S & S and we presume he conducted himself properly in his role as a city commissioner and in his role as bank loan officer. The specification change from three years to five years did not preclude Byre from bidding the second time, in fact, he did so. He simply did not bid according to the specifications nor was he the low bidder. There is no evidence that this change constituted any bidding advantage to S & S over Byre. Although

the change did allow S & S to spread payments on its start-up loan over five years instead of three and thereby improve its chances for success in the event it was awarded the bid, this is not evidence of favoritism, improvidence, extravagance, fraud or corruption. *Northern Hills Sanitation, supra.*

The second specification change when the bids were re-let added the possibility of an alternative bid based on a percentage of the gross revenue collected by City for waste disposal. The first bidding procedure was conducted before the initiated ordinance was even presented to City. Before the second bids were requested, City apparently realized that regardless of who won the bid, if Byre maintained his privately contracted customers City could not guarantee any city contractor for waste disposal a set annual fee as it had in the past. As long as a private contractor was providing a service similar to what City offered, City could not anticipate what its gross income from that service would be. On its face, this specification change would appear to be a matter of good fiscal responsibility on the part of City and as between the competing bidders, perhaps more advantageous to Byre who was striving to keep his privately contracted customers separate and apart from city-serviced customers.

■ We next examine what appears to be one of Byre's principal complaints, the fact that City billed Byre's privately contracted customers for garbage service until March 1, 1979. Byre refers to an advertisement run by City in the Chamberlain paper on November 30, 1978, which read as follows:

### GARBAGE COLLECTION

As it is the city's responsibility for sanitation effective December 1 we will be collecting the garbage. Regardless if you go with Byre and Son you will be billed $3.00 a month until the first of the year. We ask that you put your garbage in plastic bags so it will be easier for the city to handle as we do not have a garbage truck yet. Please go along with us as we are working in your best interest.

Thank you,

City Commission

Byre complains that this discouraged contracted customers and potential customers from contracting with him because they were to be billed by City regardless of who actually collected their garbage. He waxes vociferously that City did in fact bill his customers and collect the $3.00 per month fee without accounting to him for such collection. In this vein, he also complains that City refused to approve certain license transfers for some of his customers who had refused to pay City garbage bills.

Section 9 of Ordinance No. 375 mandated a charge for the collection of garbage from each family domestic unit and each place of business, such charge to be noted on the quarterly water bill. In *Owens v. City of Beresford,* 87 S.D. 8, 201 N.W.2d 890 (1972), this court held that an ordinance which mandates billings to every residence in order to finance a city-wide garbage collection and disposal system is valid and enforceable whether or not services are provided. The ad was obviously run in response to Byre's announcement that non-contracted garbage collection would end on December 1, 1978. City's ad advised residents that City would continue to pick up garbage and warned them of the ordained mandatory billing requirement. It merely "told it like it was." After enactment of Ordinance No. 416, City made arrangements to exempt Byre's customers from billing after March 1, 1979.[2] The entire issue is laid to rest on this appeal by the trial court's Instruction 21 which provided:

---

**2.** A reading of appellee's brief leaves the impression that this billing practice continued indefinitely. Byre's counsel faults City for continuing billing beyond February 15, 1978, when Byre's initiated ordinance was passed by City Council.

SDCL 2–1–12 clearly states that an initiated ordinance does not become effective until the day after the official canvass of the votes on the measure.

You are instructed that the chief fiscal officer of the city of Chamberlain had an affirmative duty to bill for garbage service as previously set out in these instructions until the passage of said city ordinance no. 416 on March 6, 1979, which relieved the said officer of such duty. However you are further instructed that the passage of city ordinance no. 416 did not relieve the chief fiscal officer from collecting garbage service fees which accrued prior to March 6, 1979.

Byre failed to file a notice of review to challenge the propriety of this instruction so it becomes the law of the case. Any argument regarding the facts of billing, the effect of billing or the consequence thereof is wholly without merit.

■ Byre complains that a conspiracy to put him out of the garbage business can be demonstrated through an examination of City's conduct. City changed the padlocks on gates to the city dump ground on February 1, 1978, when S & S's contract began. As the city contractor, Byre was given a key and allowed entry at will. During that time he was also exempt from dumping fees, that were charged to private citizens who made use of the dump. It is undisputed that City did in fact change the padlock. It is further undisputed that City also enacted Ordinance 417, which provided for a dumping fee for all persons except the city contractor. The evidence discloses, however, and Byre's brief admits, that Byre anticipated this and had made arrangements for opening his own dump site across the river. There is further evidence that Byre could have received a key but eschewed that opportunity in favor of developing his own dump site. The operation of a landfill dump site obviously entailed some expense to City for labor and equipment. Byre's expectation of free access to the city dump as a private contractor when other private users were required to pay, is untenable. The fact that the city contractor was exempt is understandable in that City retains seventeen percent of the waste disposal revenue for the purpose of dump site maintenance. Byre enjoyed this same exemption during the time he held the city contract.

■ The most serious claim of misconduct on the part of City, its officers, or employees and perhaps the only valid one, is Byre's claim that the City Finance Officer, who was also the mother of one of the S & S partners, told city employees that City's policy required all city employees to go with S & S's service. Although there is no evidence in the record that this was, in fact, an adopted city policy, it was nevertheless stated by an agent and employee of City. We note first that there is no evidence that the statement had any effect on Byre's business. The number of city employees involved is not even shown. Furthermore, as an isolated instance to show a conspiracy to ruin Byre and drive him out of business, it is pathetically weak. It does, however, show evidence of one instance of over-reaching, which would be outside City's State Action exemption and could subject it to some liability if some cause and effect relationship could be established.

The third issue City raises on this appeal is whether an initiated ordinance, petitioned for by the electorate to exempt certain residents from mandatory municipal billing for waste disposal service is a valid use of the initiative power. Byre and his supporters circulated and presented a petition to exempt Byre's private customers from the mandatory billing requirement. Initiated ordinances are permitted under Article III, section 1 of the South Dakota Constitution, which states, in part "[t]hat the people expressly reserve to themselves the right to propose measures, which ... the Legislature shall submit to a vote of the electors.... This section shall apply to municipalities." The initiated ordinance questioned here was submitted to City's electorate on March 6, 1979, and passed. The ordinance was retroactive to March 1 and double billing for waste disposal was not allowed after that date.

City contends that the mandatory billing ordinance dealt with a necessary governmental function, and as a police power reg-

ulation, could not properly be changed by an electoral petition. In its brief to this court, City specified that function as "the immediate preservation of the public peace, health or safety."

▮ Initiative is the constitutional reservation of power in the people to propose bills and laws and to enact or reject them at the polls independent of the legislative assembly. Referendum, on the other hand, is a right constitutionally reserved to the people of the state or local subdivisions thereof to have submitted for their approval or rejection any act, or part of any act, passed by the legislature which in most cases would, without action on the part of the electorate, become a law. 82 C.J.S. *Statutes* § 115 (1953). The purpose of the initiative is not to curtail or limit legislative power to enact laws, but rather to compel enactment of measures desired by the people, and to empower the people, in the event the legislature fails to act, to enact such measures themselves. The purpose of referendum is to suspend or annul laws which are not yet effective in order to provide the people a means of expressing their desire regarding a legislative proposition. *Id.* at 116. When the referendum is triggered, the people must approve a legislative proposition before it becomes operative as a law. *Id.*

▮ It has been said that the initiative power extends to all types of legislation. *Id.* at 119 *citing Dawson v. Tobin,* 74 N.D. 713, 24 N.W.2d 737 (1946); *Mitchell v. Walker,* 140 Cal.App.2d 239, 295 P.2d 90 (1956); *State ex rel. Andersen v. Leahy,* 189 Neb. 92, 199 N.W.2d 713 (1972). As a general rule, all legislative matters in which the voters have an interest are subject to the referendum unless they are excepted by constitutional provisions. A state constitutional exception which reserves power to the legislature and precludes review by the people under the referendum is an expression, within sound rules of construction, of a reservation to pass on all things not so specified. Exceptions to the right should not be denied the people unless the act in question is plainly

included in one of the excepted classes. 82 C.J.S. *Statutes* § 121; *Klosterman v. Marsh,* 180 Neb. 506, 143 N.W.2d 744 (1966).

▮ Article III, section 1 of our state constitution, which vests the legislative powers of the state in a legislature, expressly reserves the right to propose measures to the people, which measures the legislature shall enact and submit to a vote of the electors of the state. Article III, section 1, also reserves the right to require that any act which the legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions. Clearly, the latter exception applies only to referendum. It was, therefore, clearly within the power of the voters of the City of Chamberlain to initiate the ordinance which permits private contracting for garbage collection and the city council properly and legally enacted the same and submitted it to a vote of the people.

▮ We next examine City's complaint that the trial court erroneously admitted evidence regarding Byre's claim for damages. The first evidence complained of involves the so-called double billing. The trial court admitted the testimony of numerous residents that City had billed them for garbage collection even though they had paid Byre for that service. In light of the trial court's determination that this billing was mandated by statute as discussed in the second issue above, such evidence was wholly immaterial to show conspiracy or to show damages to Byre. The evidence of double billing was obviously, however, highly prejudicial to City.

▮ City next complains of the trial court's admission of evidence which showed Byre's loss of the balance of the Chamberlain garbage market over and above Byre's contracted customers. We first look at the appropriate measure of

damages. City contends that liability must be based on a causal connection between alleged unlawful conduct and the loss sustained. *City of Cleveland v. Cleveland Electric*, 538 F.Supp. 1344 (N.D.Ohio 1981). Byre, on the other hand, argues that there must merely be some reasonable basis between the conduct and the loss, citing *Eastman Kodak Co. v. Southern Photo Materials Company*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684, 689–91 (1927). We find the *Eastman Kodak* case particularly inappropriate since plaintiff in that case had a going business with a record of product sales prior to defendant's alleged unlawful acts. In the present case, to the contrary, Byre did not have any business until he breached his contract with City and endeavored to privately contract with the various residential and business customers in Chamberlain. The trial court admitted evidence that at the two relevant times, in the fall of 1978 and at the time of trial, Byre had contracts with approximately one-half of the residential market and one-half of the commercial market, with some decline in the latter category. The trial court then admitted evidence in the form of testimony and exhibits by Byre's expert which alleged that Byre's damages included the loss of the other one-half of the market. Byre had the whole market only indirectly, as the city contractor. In effect, Byre would have the courts grant him a monopoly of the market, which we decline to do. The assumption that Byre's damage was one-half of the market was groundless. The evidence relating thereto was wholly without foundation. It was obviously prejudicial.

We reverse the judgment and remand for a new trial in conformance with our decision.

FOSHEIM, C.J., and WOLLMAN, J., concur.

HENDERSON, J., and DUNN, Retired Justice, dissent.

HENDERSON, Justice (dissenting).

We here address ourselves to the misbehavior of a municipal body. State law prohibits the type of conspiratorial, nepotistic, wrongful, evil, manipulative, and tortious conduct in which the corporate body of the City of Chamberlain became deeply involved. SDCL 37–1–3.1 provides: "A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful. 'Person' means any natural person, partnership, corporation, association, or other legal entity." SDCL 37–1–3.2 further provides: "The monopolization by any person, or an attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any of the trade or commerce within this state shall be unlawful." Under SDCL 37–1–14.3, a damage remedy is provided either in equitable relief or damages. This section further provides for treble damages. SDCL 37–1–14.3 provides, inter alia, as follows:

> *A person injured in his business* or property by a violation of this chapter *may bring an action for* appropriate injunctive or other equitable relief, *damages sustained* and, as determined by the court, taxable costs and reasonable attorney's fees. The trier of fact shall increase recovery under this section to three times the damages sustained. (Emphasis supplied mine.)

The City of Chamberlain was tried, in its own county seat, and was assessed $121,500 damages for violations of the above three statutes. Beyond any shadow of a doubt, the City of Chamberlain was determined by the jury to be a conspirator in unlawful activity. Coconspirators, although not named as defendants, were officials and officers of the City of Chamberlain, and those who stood to make a profit springing from the conspiracy. In the City of Chamberlain—its very own—found it wanting at the bar of justice and ultimately determined that it had exploited its municipal power inflicting a civil wrong. Lay people's judgment, so vital to a healthy legal system, is being thwarted and substituted by a legalistic judgment far removed from the facts of this case and spirit of the Trial Courtroom.

I am shocked by the skeleton set of facts set forth in the majority opinion; moreover, the facts set forth by the author of the majority opinion seem to be in 100% conflict with the facts that the jury found. It is axiomatic that the jury resolves all fact questions. *Bogh v. Beadles*, 79 S.D. 23, 107 N.W.2d 342 (1961). A jury is entitled to accept one witness' version of the facts and reject another's. *Lukens v. Zavadil*, 281 N.W.2d 78 (S.D.1979). Here, the jury accepted the version of Byre's witnesses that there was a conspiracy and rejected the City of Chamberlain's witnesses that there was not a conspiracy. "It is the jury's function, rather than ours, to resolve conflicting evidence. *Urban v. Wait's Supermarket, Inc.*, 294 N.W.2d 793 (S.D. 1980)." *Farmers State Bank of Winner v. Westrum*, 341 N.W.2d 631, 635 (S.D.1983). "As a reviewing Court, we view the evidence and all reasonable inferences therefrom in a light most favorable to support the verdict. *Alberts v. Mut. Serv. Cas. Ins. Co.*, 80 S.D. 303, 123 N.W.2d 96 (1963)." *Id.*, 341 N.W.2d at 634–35. Without expressly so stating, it appears to me the author of the majority opinion is asserting that the evidence presented at trial does not support the jury verdict. An award of damages rests within the province of the jury and should not be freely disturbed.

A fair portrayal of the facts is indispensable to a just result. The City of Chamberlain partook of efforts to create and perpetuate a private garbage service, namely, S & S service. This is not a legitimate municipal function. S & S service is a partnership owned by Lyle Stienfeld and Bruce Steckelberg. The City of Chamberlain employs Stienfeld. As I will develop, the City of Chamberlain took this municipal employee and structured him into the private garbage service business. One Delora Steckelberg is Chamberlain's finance officer; her son is Bruce Steckelberg. Bruce Steckelberg is also the son-in-law of Lyle Stienfeld. Chamberlain's Commissioner of Garbage was Gary Busack. Busack's principal livelihood was a personal loan officer for the Tri-County State Bank of Chamberlain.

Garbage Commissioner Busack, in his own words, described Chamberlain's employee, Stienfeld, this way: "I am his banker, a friend, I would say." Byre had private contracts to service customers as a private hauler of garbage under Chamberlain City Ordinance 375. Chamberlain, by skullduggery, effectively disregarded Byre's private contracts and placed him in the position of bidding on his own customers via a bid notice of November 23 and 30, 1978. In November 1978, bid notices called for a three-year contract. Byre submitted a bid for only that portion of the customer market for which he was not privately contracted exactly as specified in the bid notices; Byre's bid was for the three-year term. Stienfeld and Steckelberg submitted a bid for a five-year contract. Upon motion and advice of Garbage Commissioner Busack, the City rejected both bids. Just five days after the rejection of both bids, Commissioner Busack motivated the City to initiate another bid. Thereupon, Chamberlain altered bid specifications to conform with the first bid submitted by S & S. Thereby, the three-year contract provision was changed to a five-year contract provision to aid and assist S & S get the bid. On January 17, 1979, Chamberlain accepted this rigged bid and once again it was Garbage Commissioner Busack who motioned for acceptance of S & S's bid. While this bidding process was under way, behind-the-scenes manipulation and maneuvering transpired. S & S owned no garbage hauling equipment, but Garbage Commissioner Busack took care of this. Busack made a bank loan to S & S for the purchase of a new garbage truck (acting as a friend and banker). During the trial, it was revealed by admissions of Busack that he had met with City employee Stienfeld in late November and early December 1978 concerning a bank loan for the purchase of a garbage truck. Conveniently, the payback on the promissory note was for five years (coinciding with the five-year garbage contract). During trial, through cross-examination, it was brought out that had the contract and the loan been for a three-year period, S & S would have gone

into the red each month. Chamberlain's Commissioner of Garbage, Busack, closed the five-year loan for the Tri-County State Bank and signed for the bank. Neither Steckelberg nor Stienfeld had ever been in the garbage business before. Steckelberg admitted that he had no assets for collateral on the garbage truck and admitted receiving a 100% bank loan. Evidence discloses that after Chamberlain's ad in the newspaper, commented on below, Byre received very few contracts as a private hauler of garbage and that he had numerous letters and telephone calls canceling his services. In an effort to stomp on Byre and his son, who worked with him, the City of Chamberlain literally attempted to exterminate him from the business. The City of Chamberlain tried to beat Byre's truck to the garbage cans by using an open truck. For a period of two months, this open truck was used by the City of Chamberlain on the City streets of Chamberlain. The fact that some people were contracted with Byre seemed to be immaterial to the City of Chamberlain. Having bridged a time gap, the City of Chamberlain permitted S & S to use the City's truck to fulfill S & S's contract because S & S did not have a garbage truck on February 1, 1979, the effective date of S & S's new contract. Delora Steckelberg, as earlier alluded to, was the finance officer for the City of Chamberlain. The City of Chamberlain paid for one-half of S & S's compensation plates, which was a highly unusual practice. There is even evidence that the City of Chamberlain did double billing (notwithstanding Byre's contracts), and then collected for services performed by Byre. Apparently, the City never accounted for one penny paid to the City for Byre's services. To further destroy Byre and force him out of business, the City of Chamberlain, acting through its officials, changed the lock to the gate of the dump ground denying Byre access. To further compound Byre's woe, it appears that the same Mr. Busack reported a complaint to South Dakota officials concerning Byre's alternative dump site. Byre had contacted a .farmer across the river about an old gravel site that need-

ed to be filled. Every effort, it seems, was made by Busack to make sure Byre was totally squeezed out of the garbage service business. Byre submitted testimony from an expert, a Professor of Economics at South Dakota State University. This professor wrote a doctorial thesis on market structure. Testimony was adduced that provided an entire framework for economic analysis of the damages to Byre and the causative actions of the City of Chamberlain. Another expert was called on behalf of Byre, namely, a college graduate with twelve years' experience as an economic planner in the government and private sector. An analysis of income and operating expenses for Byre's garbage operation was developed in great detail and from numerous resources, to wit: City Finance Office, Byre's records, income tax records, time and motion studies of Byre's operation, certified audit from the Auditor General of the State of South Dakota, fuel costs from a local station, data from the Brule County Courthouse, and information from the South Dakota Department of Transportation. This data was then contrasted to that of another private garbage collection business at Mitchell, South Dakota. Ultimately, Byre presented this testimony plus exhibits # 67 and # 68 (received without objection) establishing a loss of $83,782. Plaintiff's exhibit # 67 was an item-by-item comparison of income and expenses for the years 1979–1982, comparing the entire market against 50% of the market. Plaintiff's exhibit # 68 was a summary of income and expenses based on the total market for the years 1979–1982.

I agree with the Court's decision concerning the existence of Chamberlain's state action exemption from antitrust liability and the propriety of the initiated ordinance and jury instructions. However, I cannot agree that the City did not exceed its state action exemption or that the admission of certain damage evidence constituted reversible error. Thus, my conclusion is radically different than the majority opinion. Therefore, I vote to sustain the verdict below of $121,500. This is another

example of where government used its power to usurp the open market in the free enterprise system. It is another example of government crunching down on a little operator to grind him into oblivion. Byre operated this garbage business since 1960 when he first bought equipment from the City of Chamberlain in that year. He operates this business with his four sons working beside him and the mother acting as the bookkeeper. Not only these facts came before the jury, but the fact that Byre did an excellent job with his garbage service notwithstanding that he suffered from diabetes and was almost blind. Before the jury, he testified: "Well, it kind of looks bad. It looks like Chamberlain is trying to run me out." Therefore, it comes as no surprise to this writer that the City of Chamberlain suffered a judgment of this magnitude to be entered against it. If law is about anything, it is about being fair and the City of Chamberlain did not play fair.

A city's anticompetitive activities, "even [though] a lawful monopol[y,] may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 417, 98 S.Ct. 1123, 1138–39, 55 L.Ed.2d 364, 385 (1978) (bracketed material inserted). When the City of Chamberlain's actions are examined in toto, a shameful course of conduct aimed at running Byre out of business is exposed. First, Chamberlain advertised for bids on a three-year contract and published an ad informing residents that their garbage would be collected by City *"regardless if you go with Byre & Sons"* and that they would be billed for this service. The ad also commanded citizens to "Go along with us." The City Garbage Commissioner, in his role as a loan officer for a local bank, then began negotiating a five-year loan for a garbage truck with the partners of S & S, as related above. Obviously, the Garbage Commissioner took on a questionable and tainted dual role. Both of the bids submitted were subsequently rejected and City re-let the bids for a five-year contract. This new bid requirement corresponded

with S & S's rejected bid and their five-year equipment loan. City next changed its garbage ordinance to require a dumping fee for private garbage collectors and awarded the contract to S & S. On the start-up date of the new contract, City changed the lock to the dump gates and loaned S & S equipment so that S & S could begin fulfilling the contract. Finally, after the separate garbage services were operating, City complained to state officials about Byre's new dump facility; and the City Auditor, who is also a mother of a partner in S & S, informed some city employees that city policy required them to use the S & S garbage service. It was municipal muscle, maneuvering and manipulation to such extent that it was exploitation of their power—the very kind which the United States Supreme Court has condemned.

It cannot reasonably be contended that such maneuvering by city employees to implement a new garbage contractor and make that business a success was within the contemplation of the legislature when it enacted statutes, which in effect granted municipalities state action immunity when establishing or granting garbage removal monopolies. Whether "City could have lawfully monopolized the Chamberlain waste removal market up until March 6, 1979," is irrelevant because the action taken before that time was not within the contemplation of the authorizing legislation and thus constituted an unlawful restraint of trade not immune from antitrust liability. The fact that the acts complained of may be lawful in and of themselves is also irrelevant. "[P]laintiffs need not establish that each act was illegal. It is only necessary that the acts whether legal or illegal be in furtherance of a common plan or conspiracy in restraint of trade." *Juneau Square v. First Wis. Nat'l Bank of Milwaukee*, 435 F.Supp. 1307, 1317 (E.D.Wis. 1977) (citations omitted). "It is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Jerrold Electronics Corp. v. Wescoast Broadcasting Co.*, 341 F.2d 653, 663 (9th Cir. 1965) (citations omitted). The jury deter-

mined that a plan or scheme to run Byre out of business existed and this Court should not disturb that determination. The facts which are set forth above cry out that there existed a conspiracy in restraint of trade.

Neither can I agree with the majority's ruling in regard to the evidentiary questions presented. Testimony concerning the double billing of residents was elicited as evidence of yet another link in the conspiratorial chain and as evidence of damages resulting therefrom. The fact that the double billing was legal because mandated by ordinance does not make evidence of its occurrence and the injury caused thereby, immaterial. As stated above, each act in a restraint of trade conspiracy need not be illegal if done in furtherance of the scheme. Thus, the double billing testimony was highly admissible because it was both relevant and probative to the question of the existence of an illegal conspiracy and the resulting damages.

The majority also holds that Byre's expert's testimony about damages including the loss of the other one-half of the market not under contract was groundless and without foundation and thus inadmissible.* This author has, in great detail, exposed the foundational facts for this testimony. Moreover, the majority fails to recognize the extreme difficulty of proving the precise amount of damages in any antitrust action. This is a great academic failing of the majority writing for it ignores the substantial weight of authority in the United States. Difficulty in proving up damages in antitrust actions is illustrated by some of the following authorities. "The latitude granted the victim of antitrust violations in establishing his monetary damages has long been recognized." *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 363 (2nd Cir.1974) (citations omitted). "[T]he amount of damages need not depend on precise proof...." *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 902 (5th Cir.1973) (citations omitted), *cert. denied*, 412 U.S. 923,

93 S.Ct. 2736, 37 L.Ed.2d 150 (1973). The United States Supreme Court has also recognized the practical difficulty of proving damages. In *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684, 691 (1927), the Court said: "It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." In the case at hand, Byre sought to prove his damages by presenting an income and expense analysis of his garbage operation and private landfill. This necessarily involved a comparison of the income and expense of the portion of the market Byre had under contract and the income and expense of the total Chamberlain garbage market. Such an analysis does not grant Byre a monopoly of the garbage market but instead establishes the maximum amount of possible damages. The limitation on damages, when combined with other damage testimony, i.e., lost contracts, afforded the jury a *reasonable basis* for computing damages and avoided an award based on mere speculation, pure guesswork or conjecture. The foundation of this analysis was the facts and data involved in this case, and facts gathered by the expert which other experts would reasonably rely upon. SDCL 19–15–3. The computation of damages (received in evidence as exhibit # 67 reflecting an $83,782 loss), as testified to by Byre's expert, was properly admitted by the trial judge, for there was a proper foundation laid and no objection to its receipt in evidence. Therefore, not having objected to this damage evidence below, it cannot now be raised at the appellate level for the first time. Chamberlain did not preserve its appellate record thereon. *Weaver v. Boortz*, 301 N.W.2d 673 (S.D. 1981). *See also, Jones v. Sully Buttes Schools*, 340 N.W.2d 697 (S.D.1983); *Mortweet v. Eliason*, 335 N.W.2d 812 (S.D. 1983); *Weber v. South Dakota Dep't of Labor*, 323 N.W.2d 117 (S.D.1982); *Ward v. Viborg School Dist. No. 60–5*, 319 N.W.2d 502 (S.D.1982); *First Federal Sav.*

---

* The City's expert was Dr. Ralph Brown; this expert crumbled under cross-examination before the jury for he testified not as an expert in the garbage business but rather as a consumer of garbage. Chamberlain produced no expert or City employee providing cost figures for running its own municipal garbage service.

*& Loan v. Lovett,* 318 N.W.2d 133 (S.D. 1982). We are not trying lawsuits at the appellate level. Reference is made to the last six sentences of the majority opinion. The majority opinion indicates, in essence, that Byre's damages of $83,782 as reflected by plaintiff's exhibit # 67, was "groundless," "without foundation," and "obviously prejudicial." Counsel for the City of Chamberlain should have objected to this line of evidence and especially to these very important exhibits which were bound to have a great impact on the jury. If, indeed, it was improper for this evidence to go before the jury and to be received by this jury and to be considered by this jury in arriving at its verdict, it was for Chamberlain's counsel to object and to give the trial court an opportunity to rule immediately thereupon. The trial court is entitled to rule on an objection before we, at this level, say that it has committed an error. In conclusion, it is wrong for this Court to now fault the trial court on this matter of damages when the City of Chamberlain permitted these critical exhibits to be admitted without objection.

For these reasons, I vote to affirm the verdict and judgment below.

I am authorized to state that Retired Justice Dunn joins in this dissent.